# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ELIZABETH MORRISON, Individually And on Behalf of All Others Similarly Situated, | § § § | No. 445, 2017 |
| Appellant, Plaintiff Below, | § § § | Case Below: |
| v. | § § | Court of Chancery of the State of Delaware |
| RAY BERRY, RICHARD A. ANICETTI, MICHAEL D. CASEY, JEFFREY NAYLOR, RICHARD NOLL, BOB SASSER, ROBERT K. SHEARER, MICHAEL TUCCI, STEVEN TANGER, JANE THOMPSON, and BRETT BERRY, | § § § § § § § § | C.A. No. 12808-VCG |
| Appellees, Defendants Below. | § § § | |

Submitted: April 18, 2018
Decided: July 9, 2018
Revised: July 27, 2018

Before **STRINE**, Chief Justice; **VALIHURA** and **VAUGHN**, Justices.

Upon appeal from the Court of Chancery. **REVERSED** and **REMANDED**.

Joel Friedlander, Esquire (*argued*), Jeffrey M. Gorris, Esquire, and Christopher P. Quinn, Esquire, of Friedlander & Gorris, P.A., Wilmington, Delaware. Of Counsel: Randall J. Baron, Esquire, of Robbins Geller Rudman & Dowd LLP, San Diego, California; Christopher H. Lyons, Esquire, of Robbins Geller Rudman & Dowd LLP, Nashville, Tennessee for Appellant.

Rudolf Koch, Esquire (*argued*), Matthew D. Perri, Esquire, and Ryan P. Durkin, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware. Of Counsel: Adam L. Sisitsky, Esquire, Lavinia M. Weizel, Esquire, of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, Massachusetts; Robert I. Bodian, Esquire, and Scott A. Rader, Esquire, of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., New York, New York for Appellees *Richard A. Anicetti, Michael D. Casey, Jeffrey Naylor, Richard Noll, Bob Sasser, Robert K. Shearer, Michael Tucci, Steven Tanger, and Jane Thompson.*

John L. Reed, Esquire, Ethan H. Townsend, Esquire, and Harrison S. Carpenter, Esquire, of DLA Piper LLP, Wilmington, Delaware. Of Counsel: David Clarke, Jr., Esquire of DLA Piper LLP, Washington, D.C. for Appellees *Ray Berry and Brett Berry*.

**VALIHURA**, Justice:

This case calls into question the integrity of a stockholder vote purported to qualify for *Corwin* "cleansing." It offers a cautionary reminder to directors and the attorneys who help them craft their disclosures: "partial and elliptical disclosures"[1] cannot facilitate the protection of the business judgment rule under the *Corwin* doctrine.[2]

\* \* \*

In March 2016, soon after The Fresh Market (the "Company") announced plans to go private, the Company publicly filed certain required disclosures under the federal securities laws.[3] Given that the transaction involved a tender offer, the required disclosures included a Solicitation/Recommendation Statement on Schedule 14D-9 (together with amendments, the "14D-9"), which articulated the Board's reasons for recommending that

---

[1] *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1280 (Del. 1994).

[2] *See Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304, 312 (Del. 2015); *Appel v. Berkman*, 180 A.3d 1055, 1064 (Del. 2018).

[3] *See* 15 U.S.C. § 78n(d)(4) (requiring compliance with the terms prescribed by the SEC whenever recommending that stockholders tender their shares); 17 C.F.R. § 240.14d-9 (outlining the SEC's requirements for the 14D-9); 17 C.F.R. § 240.14d-101 (Schedule 14D-9); *see also* 3 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 11:16, Westlaw (updated May 2018) ("Schedule 14D-9 is the disclosure document that must be filed in connection with any other solicitation or recommendation for or against tender offers."). State law complements the directors' duties of disclosure under the federal securities laws. *See Arnold*, 650 A.2d at 1277 (noting that the Delaware state-law "'fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action'" is an "obligation [that] attaches to proxy statements and any other disclosures in contemplation of stockholder action." (quoting *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992))).

stockholders accept the tender offer—from an entity controlled by private equity firm Apollo Global Management LLC ("Apollo") for $28.5 in cash per share.[4] The 14D-9 also included a narrative of the events leading up to the transaction,[5] which, in addition to the tender offer, included an equity rollover whereby The Fresh Market's founder, Ray Berry, and his son, Brett—who collectively owned 9.8% of the Company's shares—were to roll over their equity and end up with an approximately 20% stake in the Company upon the closing.[6] As also required under the federal securities laws,[7] Apollo publicly filed a Schedule TO, which included its own narrative of the background to the transaction. The 14D-9 incorporated Apollo's Schedule TO by reference.[8]

---

[4] As used in this opinion, "Apollo" also refers to Apollo Management VIII, L.P., the entity involved in this deal, or equity funds managed by that entity.

[5] *See Matador Capital Mgmt. Corp. v. BRC Holdings, Inc.*, 729 A.2d 280, 295 (Del. Ch. 1998) ("Delaware law requires directors who disclose such a recommendation also disclose such information about the background of the transaction, the process followed by them to maximize value in the sale, and their reason for approving the transaction so as to be materially accurate and complete.").

[6] *See* The Fresh Market, Inc., Schedule 14D-9 Solicitation/Recommendation Statement Under Section 14(d)(4) of the Securities Exchange Act of 1934 (March. 25, 2016), at 1 (A59), 4 (A62) [hereinafter 14D-9]; Plaintiff's Opening Br. at 28-29 n.5 (calculating the Berrys' post-merger equity stake of 20% based on publicly disclosed information). The Berrys' pre-merger equity stake accounted for 9.8% of the 47,049,217 total shares outstanding. Plaintiff's Opening Br. at 28-29 n.5 (citing 14D-9, at 1 (A59)). Given the transaction price of $28.50 per share, the Berrys' stake was valued at $131.4 million, or approximately 20.0% of the transaction's total equity financing of $656 million. *Id.* (citing 14D-9, at 4 (A62)).

[7] *See* 15 U.S.C. § 78n(d)(4) (requiring compliance with the terms prescribed by the SEC whenever soliciting stockholders' shares through a tender offer); 17 C.F.R. § 240.14d-3 (requiring that the Tender Offer Statement on Schedule TO be filed with the SEC and delivered to stockholders); 17 C.F.R. § 240.14d-100 (Schedule TO).

[8] *See* 14D-9, *supra* note 6, at 59 (A117).

2

After reading these disclosures, as the tender offer was still pending, stockholder Elizabeth Morrison ("Plaintiff") suspected that the Company's directors had breached their fiduciary duties in the course of the sale process, and she sought Company books and records pursuant to Section 220 of the Delaware General Corporation Law. The Company denied her request, and the tender offer closed as scheduled on April 21 with 68.2% of outstanding shares validly tendered.[9]

Litigation over the Section 220 demand ensued, and Plaintiff obtained several key documents, such as board minutes and a crucial e-mail from Ray Berry's counsel to the Company's lawyers. Plaintiff then filed this action in the Court of Chancery. It includes a breach of fiduciary duty claim against all ten of the Company's directors, including Ray Berry, and a claim for aiding and abetting the breach against Ray Berry's son, Brett Berry, who did not serve on the Board.[10]

The thrust of Plaintiff's breach of fiduciary duty claim is that Ray and Brett Berry teamed up with Apollo to buy The Fresh Market at a discount by deceiving the Board and inducing the directors to put the Company up for sale through a process that "allowed the Berrys and Apollo to maintain an improper bidding advantage" and "predictably emerge[] as the sole bidder for Fresh Market" at a price below fair value.[11] Plaintiff also alleges that

---

[9] The Fresh Market, Inc., Form 8-K (Apr. 27, 2016), at B112.

[10] The director defendants, other than Ray Berry, filed a separate brief and defined themselves as the "Director Defendants." We use "Director Defendants" herein when quoting from their brief. We use "Defendants" to refer to all eleven defendants. Ray and Brett Berry are separately represented and filed their own brief.

[11] Verified Complaint, *Morrison v. Berry*, C.A. No. 12808-VCG, ¶ 2 (A137) [hereinafter Complaint].

Ray Berry's commitment to Apollo was not fully disclosed to the Board or to other stockholders, and that the auction that ensued led to a pre-ordained result: Apollo was the winner, with the Berrys participating in an equity rollover. In other words, Plaintiff alleges that the Board and the stockholders were misled into believing that Ray Berry would open-mindedly consider partnering with any private equity firm willing to outbid Apollo, but, instead, "[t]he reality of the situation was that Ray Berry (a) had already formed the belief that Apollo was uniquely well situated to buy Fresh Market; (b) had already entered into an undisclosed agreement with Apollo; and (c) was incentivized not to create price competition for Apollo."[12]

In moving to dismiss, Defendants argued that *Corwin* applied. Under that doctrine, the "business judgment rule is invoked as the appropriate standard of review for a post-closing damages action when a merger that is not subject to the entire fairness standard of review has been approved by a fully informed, uncoerced majority of the disinterested stockholders."[13] The *Corwin* doctrine is premised on the view that, "[w]hen the real parties in interest—the disinterested equity owners—can easily protect themselves at the ballot box by simply voting no, the utility of a litigation-intrusive standard of review promises more costs to stockholders in the form of litigation rents and inhibitions on risk-taking than it promises in terms of benefits to them."[14] The same is true of stockholders deciding

---

[12] *Id.* ¶ 16 (A142).

[13] *Corwin*, 125 A.3d at 305-06 (Del. 2015).

[14] *Id.* at 313; *In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 114-15 (Del. Ch. 2007) ("Delaware corporation law gives great weight to informed decisions made by an uncoerced electorate. When

4

whether to tender their shares, and the *Corwin* doctrine has been extended to these circumstances.[15] However, those same stockholders cannot possibly protect themselves when left to vote on an existential question in the life of a corporation based on materially incomplete or misleading information. Careful application of *Corwin* is important due to its potentially case-dispositive impact.[16]

In granting Defendants' motion to dismiss this case, the Court of Chancery stated that this matter "presents an exemplary case of the utility of th[e] ratification doctrine, as set forth in *Corwin* and *Volcano*."[17] Respectfully, we disagree.

Here, Defendants have not shown, as required under *Corwin*, that the vote was fully informed—especially given that Plaintiff's complaint alleges facts showing that the

---

disinterested stockholders make a mature decision about their economic self-interest, judicial second-guessing is almost completely circumscribed by the doctrine of ratification.").

[15] *In re Volcano Corp. S'holder Litig.*, 143 A.3d 727, 743-44, 747 (Del. Ch. 2016) (applying *Corwin* to "acceptance of a first-step tender offer by fully informed, disinterested, uncoerced stockholders representing a majority of a corporation's outstanding shares in a two-step merger" under 8 *Del. C.* § 251(h) because "[a] stockholder is no less exercising her 'free and informed chance to decide on the economic merits of a transaction' simply by virtue of accepting a tender offer rather than casting a vote. And, judges are just as 'poorly positioned to evaluate the wisdom of' stockholder-approved mergers under Section 251(h) as they are in the context of corporate transactions with statutorily required stockholder votes." (quoting *Corwin*, 125 A.3d at 312-13)), *aff'd*, 156 A.3d 697, 2017 WL 563187 (Del. 2017) (TABLE); *Larkin v. Shah*, 2016 WL 4485447, at *20 (Del. Ch. Aug. 25, 2016) (applying *Corwin* to completed first-step tender offer); *see also Berkman*, 180 A.3d at 1057-58 (reversing the Court of Chancery's dismissal under *Corwin* because, contrary to the Court of Chancery's holding, the tender offer was not fully informed).

[16] *See Singh v. Attenborough*, 137 A.3d 151, 152 (Del. 2016) (Order) ("When the business judgment rule standard of review is invoked because of a vote, dismissal is typically the result. That is because the vestigial waste exception has long had little real-world relevance, because it has been understood that stockholders would be unlikely to approve a transaction that is wasteful.").

[17] *Morrison v. Berry* (*Chancery Op.*), 2017 WL 4317252, at *1 (Del. Ch. Sept. 28, 2017) (referencing *Corwin*, 125 A.3d at 305-06; *Volcano*, 143 A.3d at 743-44, 747).

5

Company failed to disclose "troubling facts regarding director behavior . . . that would have been material to a voting stockholder."[18] A reasonable stockholder would have found these facts material because they would have shed light on the depth of the Berrys' commitment to Apollo, the extent of Ray Berry's and Apollo's pressure on the Board, and the degree that this influence may have impacted the structure of sale process. Thus, "the business judgment rule is not invoked."[19]

We REVERSE the Court of Chancery's decision for these reasons and those that follow, and we REMAND this case for further proceedings consistent with this opinion.

## I.

Plaintiff's argument on appeal is straightforward: she contends that the Court of Chancery erred in applying *Corwin* because an array of alleged deficiencies rendered the 14D-9's disclosures materially incomplete and misleading.[20] A brief overview of the key

---

[18] *Corwin*, 125 A.3d at 312; *Harbor Fin. Partners v. Huizenga*, 751 A.2d 879, 898-99 (Del. Ch. 1999) ("If the corporate board failed to provide the voters with material information undermining the integrity or financial fairness of the transaction subject to the vote, no ratification effect will be accorded to the vote and the plaintiffs may press all of their claims. . . . In this regard, it is noteworthy that Delaware law does not make it easy for a board of directors to obtain 'ratification effect' from a stockholder vote.").

[19] *Corwin*, 125 A.3d at 312.

[20] In recounting the facts of this case, "we (1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as 'well pleaded' if they give the opposing party notice of the claim, (3) draw all reasonable inferences in favor of the non-moving party, and (4) do not affirm a dismissal unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances." *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 535 (Del. 2011) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002)). Our review is *de novo*. *Id.* Further "[w]hen a plaintiff expressly refers to and heavily relies upon documents in her complaint, these documents are considered to be incorporated by reference into the complaint; this is true even where the documents are not expressly incorporated into or attached to the complaint." *Freedman v. Adams*, 2012 WL 1345638, at *5 (Del. Ch. Mar. 30, 2012) (citing *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 1594085, at *12 (Del. Ch. June 29, 2005); *e4e,*

6

dates recounted in the 14D-9 is helpful to establish the context of the alleged flaws in the disclosures.

On October 1, 2015, The Fresh Market received an "unsolicited preliminary non-binding indication of interest" from Apollo to purchase the Company for $30 per share in cash.[21] The letter stated that Apollo had discussed an equity rollover with the Berrys and had an "exclusive partnership" with them.[22] On October 15, the Company's Board convened a meeting to review the proposal and plan its course of action. The directors authorized the formation of a Strategic Transaction Committee (the "Committee"), and they specifically asked Ray Berry if he had an agreement with Apollo. Ray Berry denied that he did, and he recused himself from the meeting "so that the members of the Board

---

*Inc. v. Sircar*, 2003 WL 22455847, at \*3 (Del. Ch. Oct. 9, 2003)), *aff'd*, 58 A.3d 414 (Del. 2013). Here, the Complaint expressly refers to and relies heavily upon the two key disclosure documents—the 14D-9 and Schedule TO—as well as the Board meeting minutes and other internal documents obtained via the Section 220 Litigation. *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013), *as corrected* (Oct. 8, 2013) ("[A] plaintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms." (quoting *Fletcher Int'l, Ltd. v. ION Geophysical Corp.*, 2011 WL 1167088, at \*3 n. 17 (Del. Ch. Mar. 29, 2011)))*; In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at \*1 (Del. Ch. Oct. 10, 2016) ("This court may consider the Proxy Statement to establish what was disclosed to stockholders and other facts that are not subject to reasonable dispute." (citing *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006); *Abbey v. E.W. Scripps Co.*, 1995 WL 478957, at \*1 n.1 (Del. Ch. Aug. 9, 1995))), *aff'd*, 164 A.3d 56 (Del. 2017); *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016) ("The incorporation-by-reference doctrine permits a court to review the actual document to ensure that the plaintiff has not misrepresented its contents and that any inference the plaintiff seeks to have drawn is a reasonable one.").

[21] 14D-9, *supra* note 6, at 17 (A75).

[22] Complaint, *supra* note 11, ¶ 44 (A150) (quoting Apollo letter to Board).

could engage in a discussion without him present."[23] Following that meeting, Ray Berry recused himself from Board meetings through the date the Company entered into the merger agreement.[24]

In a letter dated as of that date, October 15, 2015, Apollo stated that its proposal would expire on October 20, and, on October 21, the firm formally withdrew it. But, on November 25, Apollo reaffirmed the same proposal and again stated that it "was making the proposal together with Ray Berry and Brett Berry."[25] The Company's lawyers wrote Ray Berry's counsel seeking clarity on Ray Berry's status with Apollo. Ray Berry's counsel responded by e-mail on November 28 (the "November 28 E-mail").[26] That e-mail referred to an agreement that Ray Berry had with Apollo in October—an agreement that can rationally be seen as contrary to Ray Berry's representation to the Board on October 15 that he had no such agreement. The sale process officially began on December 3, the day after the conclusion of a two-day Board meeting.[27]

Plaintiff identifies a number of problems that allegedly render the 14D-9 materially misleading, including the following four:

---

[23] The Fresh Market, Inc., Minutes of the Board of Directors Meeting (Oct. 15, 2015), at A31 [hereinafter Oct. 15, 2015 Minutes]. Before the next Board meeting, Ray Berry also provided a written waiver of notice of any Board meetings at which directors planned to discuss any inquiry from a potential acquirer, including Apollo's proposal. 14D-9, *supra* note 6, at 18-19 (A76-77).

[24] 14D-9, *supra* note 6, at 19 (A77).

[25] *Id.* at 20 (A78).

[26] *See id.*; David Clarke to Damien Zoubek and Mark Gentile, E-mail (Nov. 28, 2015), at A40 [hereinafter Nov. 28 E-mail].

[27] 14D-9, *supra* note 6, at 20-21 (A78-79).

First, the November 28 E-mail from Ray Berry's counsel reveals that Berry had an agreement with Apollo as of October, and that revelation must have suggested to the Board that Berry had not been forthcoming as he previously had denied the existence of an agreement. But, because the 14D-9 never disclosed this information, the 14D-9 omitted material information or was misleading.

Second, Ray Berry's statements expressing a clear preference for a rollover transaction involving Apollo—and reluctance to engage in such a transaction if another buyer were to prevail—were material, and these statements were never disclosed to stockholders. In fact, the 14D-9 disclosures implied otherwise—*i.e.*, that Ray Berry was willing to partner with a party other than Apollo.

Third, the 14D-9 never disclosed a "threat" contained in the November 28 E-mail— that Ray Berry would sell his shares if the Board did not undertake a sale process.

Fourth, Plaintiff also alleges that the Board misrepresented the reasons that the Board formed the Committee tasked with overseeing a sale process because the 14D-9 failed to state that the directors were motivated by *existing* activist pressure.

Though Plaintiff challenges the adequacy of other disclosures, such as those concerning the management projections reviewed by the Board, we need not consider them here given that the aforementioned deficiencies in the disclosures prove sufficient to deny *Corwin* "cleansing."

*Plaintiff alleges serious misrepresentations—both to the Board, and to stockholders—about Ray Berry's "agreement" with Apollo.*

The November 28 E-mail indicates that Ray Berry had agreed as early as October that, if Apollo reached a deal with the Board to purchase the Company, he would roll over his equity interest. But the 14D-9 never mentioned the October agreement and even suggested that, to the contrary, none ever existed.[28] And the Company's Board minutes show that Ray Berry also never disclosed this "agreement" to his fellow directors, even when he was asked directly about his arrangement with Apollo at the October 15, 2015 Board meeting. Plaintiff alleges that the omission of the November 28 E-mail's revelation of an October agreement (the "Agreement Omission") is material "not only in substance but also because it shows that Ray Berry was lying to the Board, the Board was on notice that Ray Berry was lying to them and the Board did nothing to address it."[29]

The following chart compares the 14D-9's summary of the November 28 E-mail with the actual e-mail. Italicized words indicate portions omitted from the 14D-9.

| 14D-9[30] | November 28 E-Mail[31] |
|---|---|
| Berry's counsel . . . stated that since [Apollo's] earlier offer had expired on October 20, 2015, Mr. Berry had engaged in one conversation with [Apollo], and | Since Apollo withdrew its earlier offer in October, Mr. Berry has had one conversation with Apollo. During that conversation, he agreed, *as he did in* |

---

[28] *See, e.g.*, *id.* at 17 (A75) ("Mr. Berry further advised [the Company's general counsel] that he had not been involved in [Apollo]'s formulation of its proposal, he had not committed to any participation in a transaction with [Apollo] (or any other potential buyer) and he was not working with [Apollo] on an exclusive basis.").

[29] Complaint *supra* note 11, ¶ 124 (A184).

[30] 14D-9, *supra* note 6, at 20 (A78).

[31] Nov. 28 E-mail, *supra* note 26, at A40.

| during that conversation he had agreed that he would roll his equity interest over into the surviving entity if [Apollo] were to be successful in agreeing to a transaction with TFM.[32] | *October*, that, in the event Apollo agreed on a transaction with TFM, he would roll his equity interest over into the surviving entity. *Apollo determined the price that was offered.* |
|---|---|

Plaintiff alleges that the exclusion of "as he did in October" from the 14D-9 is a material omission not just on its own, but because it undermines the veracity of other statements that Berry had made to both the Company's general counsel and its Board. For example, the 14D-9 states that, on October 5, 2015, Ray Berry told the Company's general counsel that he had told Apollo that he "*would consider* an equity rollover depending upon the terms . . . ."[33] But the 14D-9 omits reference to any *agreement* to engage in an equity rollover as of that time. In fact, the 14D-9 also states that Berry even told the general counsel that "he had not been involved in [Apollo's] formulation of its proposal, he had not committed to any participation in a transaction with [Apollo] (or any other potential buyer) and he was not working with [Apollo] on an exclusive basis."[34] And, when the Board convened its telephonic meeting on October 15, Berry "reiterated that he had not

---

[32] In their separate answering brief, the Director Defendants point to this sentence and assert that, "contrary to Plaintiff's assertion that the Chancery Court 'confused how Ray Berry's October agreement with Apollo was disclosed to the Board on November 28, but was never disclosed to the stockholders,' the Chancery Court correctly recognized that Ray Berry's pre-November 28 agreement with Apollo was explicitly disclosed." Director Defendants' Answering Br. at 32 (quoting Plaintiff's Opening Br. at 8). This assertion is obviously incorrect as the sentence from the 14D-9 quoted above does not reveal the existence of an agreement predating the post-October 20, 2015 agreement.

[33] 14D-9, *supra* note 6, at 17 (A75) (emphasis added).

[34] *Id.*

11

committed to any transaction with [Apollo] (or any other potential bidder)," as recounted in the 14D-9.[35]

Moreover, even if the Schedule TO is also considered to be part of the "total mix" of information disclosed to stockholders, as the Director Defendants urge, any impression of an agreement is undermined by the 14D-9's suggestions to the contrary. The Schedule TO discloses that Apollo called the Berrys just before the submission of its October 1 proposal "to *confirm* whether they would participate in such a transaction,"[36] and states that the Berrys "indicated they were interested"—albeit with a caveat that they needed flexibility and Board approval.[37] In contrast, though the 14D-9 references several conversations that Ray Berry had with Apollo before its submission of the October 1 proposal, it undermines any impression one might get of an agreement by describing Apollo's last pre-October 1 call as a "courtesy call" in which Apollo stated that it would be submitting an offer.[38]

---

[35] *Id.* at 17-18 (A75-76).

[36] Offer to Purchase for Cash All Outstanding Shares of Common Stock of The Fresh Market, Inc., dated Mar. 25, 2016, Exhibit (a)(1)(A) to Schedule TO Tender Offer Statement under Section 14(d)(1) or 13(e)(1) of the Securities Exchange Act of 1934, filed by Pomegranate Merger Sub, Inc., Pomegranate Holdings, Inc., & Apollo Management VIII, L.P., (Mar. 25, 2016), at 28 (A130) (emphasis added) [hereinafter Schedule TO].

[37] *See id.* (noting that the Berrys "indicated that they would like to retain the flexibility to participate in a similar transaction with other potential transaction partners in the event that Management VIII's proposal was not well received by The Fresh Market Board.").

[38] *See* 14D-9, *supra* note 6, at 17 (A75) (describing the conversation as a "courtesy call in which [Apollo] informed Mr. Berry that [Apollo] would be sending an offer letter to TFM and in which Mr. Berry did not communicate any positions that were inconsistent with his prior statements.").

Moreover, the 14D-9 omits any mention of Brett Berry in its description of Apollo's pre-October 1 contacts with Ray Berry—allegedly because a reference to these discussions would bolster the impression of an agreement among Apollo, Ray Berry, and Brett Berry.[39] Nor does it disclose that, at the October 15, 2015 Board meeting, Ray Berry told the directors that he "was not aware of any conversation that may or may not have occurred with Apollo and Brett Berry."[40] Plaintiff alleges that, given that the Schedule TO suggests that Ray Berry *was* in fact aware of such conversations,[41] this omission is material because, if revealed, it would have informed stockholders that the Company's directors "blinded themselves to the reality of the joint plan among Apollo, Ray Berry and Brett Berry."[42] Moreover, even if Ray Berry and the 14D-9's statement that he "had not been involved in [Apollo's] formulation of its proposal"[43] were literally true, Plaintiff alleges that it is

---

[39] *See* Complaint, *supra* note 11, ¶¶ 18-19 (A142-43) (alleging that the 14D-9 omits facts that, "if disclosed, would call into question the veracity of the narrative that Ray Berry was open to working with alternative bidders and would point instead to the reality that Ray Berry, Brett Berry and Apollo had formulated and acted pursuant to a plan to buy Fresh Market at a vulnerable time at the lowest possible price . . . .").

[40] Oct. 15, 2015 Minutes, *supra* note 23, at A31.

[41] In contrast to the 14D-9, the Schedule TO indicates that, when Ray Berry spoke with the Apollo representative, senior partner Andrew Jhawar, on September 4, 2015, Berry "recommended that Mr. Jhawar contact his son, Brett Berry, to explore various structural alternatives for an equity rollover transaction." Schedule TO, *supra* note 36, at 27 (A129). The Schedule TO adds that, indeed, "Mr. Jhawar and Brett Berry had several communications regarding potential transaction structures." *Id.* Given that Ray Berry had recommended that Jhawar contact Brett, Plaintiff alleges that it is reasonable to infer that Ray Berry knew such conversations occurred before Apollo submitted its proposal. *See* Complaint, *supra* note 11, ¶ 43 (A150).

[42] Complaint, *supra* note 11, ¶ 48 (A152) (arguing that "[t]he most logical reason the Company omitted this information is that the Board failed to inquire further and learn that Ray Berry had instructed Apollo to speak directly to Brett Berry").

[43] 14D-9, *supra* note 6, at 17 (A75).

13

misleading because it omits that he was involved by providing indications of his interest and directing the Apollo senior partner, Andrew Jhawar, to contact Brett Berry to explore "various structural alternatives for an equity rollover transaction," and Jhawar and Brett Berry then "had several communications regarding potential transaction structures."[44]

B. *Plaintiff alleges that the 14D-9 misled stockholders about Ray Berry's clear preference for Apollo.*

Plaintiff alleges that the 14D-9 misleadingly conveys an impression that Berry would open-mindedly consider offers from a potential purchaser other than Apollo. The narrative in the 14D-9 fails to mention that Ray Berry divulged to the Board his clear preference for Apollo and reluctance to consider bids from other prospective purchasers.

For example, the 14D-9 states that, at the October 15 Board meeting, Berry told the directors that "he had communicated to [Apollo] that he would only participate in a transaction that was supported by the Board and that he would also be willing to sell his shares to any potential purchaser for cash in a Board-supported transaction."[45] But the 14D-9 never mentions that, in response to a question from the Company's outside counsel, Cravath, Swaine & Moore LLP, as to whether "he would be willing to participate in an equity rollover with another party were the Corporation to engage in [a] sale transaction with a party other than Apollo," Ray Berry also told the Board that "he was not aware of any other potential private equity buyer that had experience in the food retail industry with

---

[44] *See* Schedule TO, *supra* note 36, at 27-28 (A129-30).

[45] 14D-9, *supra* note 6, at 18 (A76).

whom he would be comfortable engaging in an equity rollover."[46]  A fair implication of this statement in the minutes is that, while Ray Berry would be willing to consider selling his shares to another private equity buyer for cash, he would not engage in an equity rollover with a party other than Apollo.  But the 14D-9 never discloses that fact.

The November 28 E-mail further suggests Ray Berry's resistance to participate in an equity rollover with a non-Apollo party, but the 14D-9's account never mentions that resistance in its summary.  Again, a comparison between the disclosure of the November 28 E-mail and the November 28 E-mail itself is illustrative.  (Italicized words indicate substantive information omitted.)

| 14D-9[47] | November 28 E-Mail[48] |
|---|---|
| Mr. Berry's counsel also said that in the event that another buyer, and not equity funds managed by [Apollo], were to acquire TFM, Mr. Berry would also consider rolling his equity interest over in such a transaction. | Should Apollo not be successful in its bid, Mr. Berry would consider rolling his equity interest over in connection with an acquisition of TFM by another buy-out firm that successfully bids for the company, *provided he has confidence in its ability to properly oversee the company. As he mentioned to the board of directors in October, however, he believes that Apollo is uniquely qualified to generate value because of its recent success in TFM's space with the acquisition of Sprouts.* |

---

[46] Oct. 15, 2015 Minutes, *supra* note 23, at A31.

[47] 14D-9, *supra* note 6, at 20 (A78).

[48] Nov. 28 E-mail, *supra* note 26, at A40.

15

Whereas the 14D-9 states that Ray Berry was willing to consider an equity rollover with a party other than Apollo, Plaintiff alleges that the omitted portion suggests that the opposite is the case: that he would be willing to consider such an equity rollover only if he "has confidence in [the firm's] ability to properly oversee the company," and he only had confidence in one party, namely, Apollo.[49]  If, as Plaintiff fairly alleges, Ray Berry were only willing to consider an equity rollover with a qualified party, and Apollo was "uniquely qualified," then Ray Berry was not, in fact, willing to consider an equity rollover with another party.

C.    *Plaintiff alleges that the 14D-9 failed to disclose Ray Berry's "threat" to sell the Company.*

Plaintiff alleges that the November 28 E-mail reveals that the 14D-9 is marred by another material omission: the 14D-9 never mentions that Ray Berry's counsel emphasized his client's belief that the Company needed to go private and that, if it stayed public, Ray Berry would sell his shares.  Specifically, Berry's attorney stated in the November 28 E-mail that Ray Berry believed it was "in the best interests of the shareholders for the board to pursue a sale of the company at this time due to the low valuation of the company in spite of a built-in buy-out premium as well as the complexity of implementing the changes [new CEO] Rick Anicetti covered in the earnings release while under the scrutiny of the public market."[50]  But the 14D-9 does not include anything resembling a summary of that assertion.  Berry's counsel stated further that, "If The Fresh Market remains public, Mr.

---

[49] *Id.*
[50] *Id.*

Berry will give serious consideration to selling his stock when permitted as he does not believe TFM is well positioned to prosper as a public company and he can do better with his investment dollars elsewhere."[51]  Again, this assertion is missing from the 14D-9.

> D.     *Plaintiff alleges that the 14D-9 misled stockholders about the Company's reasons for forming the Strategic Transaction Committee.*

Plaintiff alleges that the 14D-9 misled stockholders concerning *existing* activist stockholder pressure facing the Company at the time of the October 15, 2015 Board meeting, when the directors decided to form the Strategic Transaction Committee.  The 14D-9 states that the Board decided to form the Committee in order "to enhance efficiency in light of the fact that TFM *could become* the subject of shareholder pressure and communications and potentially additional unsolicited acquisition proposals in light of TFM's recent stock performance."[52]  It fails to mention that the Company had *already* become subject to stockholder pressure and that the Board considered that fact when deciding to form the Committee.  According to the minutes of the October 15 meeting, the Board discussed "that there *had been* a *significant amount of shareholder outreach recently* regarding the strategic direction of the Corporation in light of the Corporation's performance and the trends facing the industry."[53]  In particular, the directors addressed a letter dated October 8, 2015, from activist investor Neuberger Berman LLC, which owned

---

[51] *Id.*

[52] 14D-9, *supra* note 6, at 18 (A76) (emphasis added).

[53] Oct. 15, 2015 Minutes, *supra* note 23, at A32 (emphasis added).

17

3.4% of the Company's shares.[54] The letter listed grievances with The Fresh Market's performance and proclaimed that "urgent action is necessary to restore credibility and prevent further damage to this asset base."[55] Neuberger stated that "it is now time" for the Board "to initiate a comprehensive strategic review" and "consider in that review hiring outside financial advisers to assess: (i) a sale of the Company, (ii) possible strategic partnerships, joint ventures, or alliances, or (iii) other possible internal investments or external transactions."[56]

## II.

Reviewing the Court of Chancery's decision to dismiss the complaint *de novo*,[57] we reverse because Defendants did not meet their burden for triggering application of the business judgment rule under *Corwin*.[58]

We focus on whether the stockholder vote was fully informed—that is, whether the Company's disclosures apprised stockholders of all material information and did not

---

[54] Charles Kantor to Richard Noll, Letter on behalf of Neuberger Berman LLC to Lead Independent Director of the Board (Oct. 8, 2015), at A26 [hereinafter Neuberger Letter]; Oct. 15, 2015 Minutes, *supra* note 23, at A32. Neuberger owned 1.6 million of The Fresh Market's 47,049,217 total shares outstanding. Neuberger Letter, at A26; 14D-9, *supra* note 6, at 1 (A59).

[55] Neuberger Letter, *supra* note 54, at A26.

[56] *Id.* at A27.

[57] *Brinckerhoff v. Enbridge Energy Co.*, 159 A.3d 242, 252 (Del. 2017).

[58] *Corwin*, 125 A.3d at 312 n.27 ("The burden to prove that the vote was fair, uncoerced, and fully informed falls squarely on the board." (quoting *Huizenga*, 751 A.2d at 899)); *Yiannatsis v. Stephanis by Sterianou*, 653 A.2d 275, 280 (Del. 1995) ("The burden rests on the party claiming the ratification to establish that the stockholder approval resulted from a fully informed electorate." (quoting E. Folk, R. Ward & E. Welch, *Folk on the Delaware General Corporate Law* § 144.5.2.3 (1992))) (emphasis removed).

materially mislead them.[59] At the pleading stage, that requires us to consider whether Plaintiff's complaint, when fairly read, supports a rational inference that material facts were not disclosed or that the disclosed information was otherwise materially misleading.[60]

"An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[61] Framed differently, an omitted fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[62] But, to be sure, this materiality test "does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote."[63]

---

[59] *Berkman*, 180 A.3d at 1057 ("Precisely because Delaware law gives important effect to an informed stockholder decision, Delaware law also requires that the disclosures the board makes to stockholders contain the material facts and not describe events in a materially misleading way.").

[60] *See id.* at 1064 (reversing a motion to dismiss because the complaint's "omitted facts are material and their omission precludes the invocation of the business judgment rule standard at the pleading stage"); *Huizenga*, 751 A.2d at 881 (because "[t]he complaint fails to state a claim that the disclosures in connection with the Merger were misleading or incomplete . . . the business judgment rule standard of review is invoked . . . ."). We agree with the Chancellor's statement in *Solera* that "a plaintiff challenging the decision to approve a transaction must first identify a deficiency in the operative disclosure document, at which point the burden would fall to defendants to establish that the alleged deficiency fails as a matter of law in order to secure the cleansing effect of the vote." *In re Solera Holdings, Inc. S'holder Litig.*, 2017 WL 57839, at *8 (Del. Ch. Jan. 5, 2017) (citing *Huizenga*, 751 A.2d at 890 n.36, in support of this proposition).

[61] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

[62] *Id.* (quoting *TSC Indus.*, 426 U.S. at 449).

[63] *Id.* (quoting *TSC Indus.*, 426 U.S. at 449). We have reaffirmed the *TSC* standard for materiality, consistent with the definition of materiality under the federal securities laws, "in a long line of cases," most recently in *Appel v. Berkman*, 180 A.3d at 1063 n.36 (quoting 2 Stephen A. Radin, *The Business Judgment Rule* ch. II, § E(3)(a), at 1741 (6th ed. 2009) (collecting cases)).

19

Just as disclosures cannot omit material information, disclosures cannot be materially misleading. As we said in *Arnold v. Society for Savings Bancorp, Inc.*,[64] "once defendants traveled down the road of partial disclosure of the history leading up to the Merger . . . they had an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events."[65] And, in *Zirn v. VLI Corp.*,[66] we explained that, "even a non-material fact can, in some instances, trigger an obligation to disclose additional, otherwise non-material facts in order to prevent the initial disclosure from materially misleading the stockholders."[67]

Here, the Court of Chancery stated that, if the Plaintiff could adequately allege in her pleadings that "the apparent robustness of the auction was a sham" and "[Ray] Berry had already made up his mind that he wished Apollo to be the acquirer and only Apollo had a shot at winning the auction," then "surely the disclosures were flawed and inadequate

---

[64] 650 A.2d 1270 (Del. 1994).

[65] *Id.* at 1280. *But see id.* ("Delaware law does not require disclosure of inherently unreliable or speculative information which would tend to confuse stockholders or inundate them with an overload of information."). Our disclosure jurisprudence is conscious of the risks of overdisclosure, such as "bury[ing] the shareholders in an avalanche of trivial information." *Solomon v. Armstrong*, 747 A.2d 1098, 1130 (Del. Ch. 1999) (internal quotation marks omitted), *aff'd*, 746 A.2d 277 (Del. 2000). Assessing whether a given fact is material "requires a careful balancing of the potential benefits of disclosure against the possibility of resultant harm." *Arnold*, 650 A.2d at 1279.

[66] 681 A.2d 1050 (Del. 1996).

[67] *Id.* at 1056; *see also Pfeffer v. Redstone*, 965 A.2d 676, 689 (Del. 2009) ("It is well settled that '[w]hen fiduciaries undertake to describe events, they must do so in a balanced and accurate fashion, which does not create a materially misleading impression.'" (quoting *Clements v. Rogers*, 790 A.2d 1222, 1240 (Del. Ch. 2001))).

to allow the vote to serve as a ratification of the Defendants' actions."[68]  But the trial court rejected Plaintiff's argument because it found "the *facts* regarding Berry's involvement with Apollo were disclosed" and, thus, "[t]he conclusion that the Plaintiff reaches—that the auction was a sham—is not supported by the record."[69]  Respectfully, we disagree.

Plaintiff has unearthed and pled in her complaint specific, material, *undisclosed facts* that a reasonable stockholder is substantially likely to have considered important in deciding how to vote.[70]  We believe a reasonable stockholder likely would find such information important because it would have helped the stockholder to reach a materially more accurate assessment of the probative value of the sale process.  These facts include "troubling facts regarding director behavior,"[71] and thus we conclude that there is a substantial likelihood that they would have altered the total mix of information available to stockholders.

A. *Plaintiff adequately alleges material omissions in the 14D-9 concerning Ray Berry's "agreement" with Apollo and relationship with the firm.*

Plaintiff alleges that the phrase "as he did in October" in the November 28 E-mail should have informed directors that Ray Berry had "lied" at their October 15 meeting, but that agreement and its eventual disclosure to the directors was never disclosed to the

---

[68] *Chancery Op.*, 2017 WL 4317252, at *2.

[69] *Id.* at *3.

[70] *See Cent. Mortg.*, 27 A.3d at 536 ("[I]t may, as a factual matter, ultimately prove impossible for the plaintiff to prove his claims at a later stage of a proceeding, but that is not the test to survive a motion to dismiss."); *infra* note 20.

[71] *Corwin*, 125 A.3d at 312.

Company's stockholders.[72]  This omission seems to undermine the veracity of Ray Berry's statement to the Board that, as of the October 15 meeting, "he had not committed to any transaction with [Apollo]," as suggested in the Schedule 14D-9[73] and the minutes.[74]

We agree with the Plaintiff that this Agreement Omission was material.[75]  A reasonable stockholder would want to know the facts showing that Ray Berry had not been forthcoming with the Board about his agreement with Apollo (among other information discussed below),[76] as directors have an "'unremitting obligation' to deal candidly with their fellow directors."[77]  Moreover, a reasonable stockholder would want to know about this level of commitment to a potential purchaser, in the context of this deal.[78]

---

[72] *See supra* note 32.

[73] 14D-9, *supra* note 6, at 17-18 (A75-76).

[74] Oct. 15, 2015 Minutes, *supra* note 23, at A31.  The Court of Chancery reasoned that, "[t]o the extent disclosed facts must have demonstrated Berry's mendacity to the directors, it should have been equally clear to the stockholders themselves." *Chancery Op.*, 2017 WL 4317252, at *3.  We do not understand that statement.  Plaintiff's allegation that Ray Berry lied to the directors is not based on disclosed facts, but rather on November 28 Counsel E-mail obtained through her Section 220 Litigation—particularly the portions omitted from the description of the e-mail in the 14D-9.  Thus, this "mendacity" could not have been clear to stockholders from the face of the disclosures.

[75] *See* Complaint, *supra* note 11, ¶ 124 (A184).

[76] In order for a vote to be fully-informed under *Corwin*, directors must disclose all those "troubling facts regarding director behavior" material to a voting stockholder.  *See Corwin*, 125 A.3d at 312; *Solera*, 2017 WL 57839, at *9 (citing *Corwin*, 125 A.3d at 212).

[77] *HMG/Courtland Properties, Inc. v. Gray*, 749 A.2d 94, 119 (Del. Ch. 1999) (quoting *Mills Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1283 (Del. 1989)); *see also Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1061 (Del. Ch. 2004) (finding director liable for breach of the fiduciary duty of loyalty for failing to "fulfill his obligation to be candid to his fellow directors," including by "purposely denying the [company's] board the right to consider fairly and responsibly a strategic opportunity within the scope of its Strategic Process and diverting that opportunity to himself.").

[78] Plaintiff also alleges that the existence of an agreement between the Berrys and Apollo indicates that they "had formed a group with the intention of changing or influencing the control over the

Though the 14D-9 does mention certain of Ray Berry's prior conversations with Apollo, the 14D-9 avoids implying any agreement with Apollo and limits facts that might suggest such an impression. For example, whereas the Schedule TO describes the last pre-October 1 call from Apollo to the Berrys as a call "to confirm they would participate in such [an equity rollover] transaction,"[79] the 14D-9 merely describes it as a "courtesy call."[80]

The 14D-9's failure to mention Brett Berry also supports a pleading-stage inference that the 14D-9 is so committed to "the false proposition that Ray Berry, Brett Berry and Apollo were not acting pursuant to a plan" that it presents a distorted narrative.[81] As Plaintiff alleges, if included, this information would help show that "Ray Berry, Brett Berry and Apollo had formulated and acted pursuant to a plan to buy Fresh Market at a vulnerable

---

Company," and, thus, Section 13(d) of the Securities Exchange Act of 1934 required them to file a beneficial ownership report on Schedule 13D. But "[t]hey never did so." Complaint, *supra* note 11, ¶ 67 (A159).

[79] Schedule TO, *supra* note 36, at 28 (A130).

[80] 14D-9, *supra* note 6, at 17 (A75). Moreover, the Schedule TO's description of the three pre-October 1 conversations between Apollo's Jhawar and the Berrys is, at least, somewhat inconsistent with the statements in the Schedule 14D-9 that Berry "had not been involved in [Apollo's] formulation of its proposal," and that Berry had not committed to the proposal or to working exclusively with Apollo. *See id.* Indeed, in addition to the distinction between a "courtesy call" and a confirmatory one, the Schedule TO indicates that Ray Berry and Jhawar were "long-time professional and social acquaintances," and that, before Apollo's submission of its proposal, Ray Berry directed Jhawar to speak with his son, Brett, "to explore various structural alternatives for an equity rollover transaction," and the two men then "had several communications regarding potential transaction structures." Schedule TO, *supra* note 36, at 27 (A129). Director Defendants' answering brief includes several block quotations to the Schedule TO. *See* Director Defendants' Answering Br. at 18-19, 21, 22-23. But their inclusion does not help the Defendants' case. The tension between the 14D-9 and Schedule TO puts stockholders in the untenable position of determining which one is accurate.

[81] Complaint, *supra* note 11, ¶ 18 (A142).

time at the lowest possible price."[82]  We agree that Plaintiff's allegations are sufficient to prevent invocation of the business judgment rule under *Corwin*.

> **B.** *Plaintiff adequately alleges that the 14D-9 is materially misleading about Ray Berry's clear preference for Apollo and willingness to consider an equity rollover.*

Plaintiff adequately alleges that the 14D-9 is materially misleading because it repeatedly includes statements that imply an openness to consider other bidders, while omitting Ray Berry's statements from those same conversations that suggest that he would actually only consider an equity rollover with Apollo.  The 14D-9 posits that, at the October 15 Board meeting, Berry stated that he would be willing to sell his shares for cash to other potential bidders and that he had not yet committed to Apollo, evoking an impression of openness.[83]  Yet the 14D-9 omits that, when asked by the Board's counsel about an *equity rollover* with a party other than Apollo, Ray Berry's comments indicated that *only* Apollo would suffice: he stated that he was unaware of "any other potential private equity buyer that had experience in the food retail industry with whom he would be comfortable engaging in an equity rollover."[84]  Such omission is material because, if disclosed, a reasonable stockholder might infer that Berry's expression of a clear preference for Apollo

---

[82] *Id.* ¶ 19 (A143).  In *In re Topps Co. S'holders Litig.*, 926 A.2d 58 (Del. Ch. 2007), the court found the proxy statement materially misleading because it evoked "an impression that Topps managers have been given no assurances about their future by [the prospective purchaser]," whereas, "[i]n reality, [that potential purchaser] has premised his bid all along as one that is friendly to management and that depends on their retention." *Id.* at 74.  Similarly, the 14D-9 presents a misleading impression of the Berrys' and Apollo's level of commitment to each other.

[83] *See* 14D-9, *supra* note 6, at A76.

[84] Oct. 15, 2015 Minutes, *supra* note 23, at A31.

and reluctance to engage with other bidders hindered the openness of the sale process, notwithstanding that Ray Berry also submitted that "he had not committed to any transaction with Apollo."[85]

Even more, the description of the November 28 E-mail includes the statement that Ray Berry would consider an equity rollover involving another buyer, but it omits the crucial precondition—that he must have "confidence in [the firm's] ability to properly oversee the company"[86]—and that Berry believed that Apollo was "uniquely qualified to generate value because of its recent success in TFM's space with the acquisition of Sprouts,"[87] effectively ruling out other parties despite the 14D-9's suggestion to the contrary. Directors cannot fulfill their disclosure obligations through such partial disclosure—that is, where material facts are either not disclosed or "presented in an ambiguous, incomplete, or misleading manner."[88] Stockholders are "entitled to a balanced and truthful recitation of events, not a sanitized version that is materially misleading."[89]

### C. Plaintiff adequately alleges that the 14D-9's omission of Ray Berry's "threat" to sell his shares is material.

Plaintiff adequately alleges that the 14D-9 omits the material statement from the November 28 E-mail that Ray Berry believed that the Board should pursue a sale of the

---

[85] *Id.*

[86] Nov. 28 E-mail, *supra* note 26, at A40.

[87] *Id.*

[88] *Berkman*, 180 A.3d at 1064 (quoting 2 Edward P. Welch et. al., *Folk on the Delaware General Corporation Law* § 212.04, at 7-78 to 7-79 (6th ed. 2014)).

[89] *In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 451 (Del. Ch. 2002).

Company "at this time" and that, if it failed to act, he would sell his shares[90]—a warning that Plaintiff characterizes as a threat. We do not embrace Plaintiffs' characterization of this as a threat, but we do view it as an economically relevant statement of intent.

The Court of Chancery considered the omission of this so-called "threat" to be the "only factual lacuna in the disclosures that comes close to materiality."[91] But the court dismissed it because it reasoned that "it would not have made investors less likely to tender if they knew that a large blockholder—the founder—was considering a sale if the deal was not consummated."[92] That is not the test. Omitted information is material if there is a substantial likelihood that a reasonable stockholder would have considered the omitted information important when deciding whether to tender her shares or seek appraisal.[93] This is any information that an investor would consider important. Such information could make a stockholder less likely to tender. But it also may be material if it is the sort of information that would make a stockholder *more likely* to tender, or just information that a reasonable stockholder would generally want to know in making the decision, regardless

---

[90] Nov. 28 E-mail, *supra* note 26, at A40 ("If The Fresh Market remains public, Mr. Berry will give serious consideration to selling his stock when permitted as he does not believe TFM is well positioned to prosper as a public company and he can do better with his investment dollars elsewhere.").

[91] *Chancery Op.*, 2017 WL 4317252, at *3.

[92] *Id.*

[93] *See Berkman*, 180 A.3d at 1057-58, 1064.

of whether it actually sways a stockholder one way or the other, as a single piece of information rarely drives a stockholder's vote.[94]

Further, the November 28 E-mail included Berry's counsel's communication of the reason *why* Ray Berry believed that it was time to sell the Company.[95] A reasonable stockholder would want to know the rationale that Ray Berry gave the Board in encouraging it to pursue the sale, as well as his communication of his intent to sell his shares if a transaction were not consummated.[96]

D. *Plaintiff adequately alleges that the 14D-9's presentation of the Board's reasons for forming the Strategic Transaction Committee are materially misleading.*

Plaintiff alleges that the 14D-9 "conceals the pressure on the Board from activist stockholders to sell the Company."[97] But the trial court dismissed that argument, finding

---

[94] Radin, *supra* note 63, ch. II, § E(3)(a), at 1746 ("To establish materiality, 'it need not be shown that an omission or distortion would have made an investor change his overall view of a proposed transaction' or that 'the information be of such import that its revelation would cause an investor to change his vote,' but 'it must be shown that the fact in question would have been relevant to him.'" (quoting *Zirn v. VLI Corp.*, 621 A.2d 773, 779 (Del. 1993))); 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 17.2[B][1] (3d ed.) ("Although the omission or distortion need not be shown to have made an investor change his vote or overall view of a proposed transaction, to be material it need only be demonstrated that the fact in question, when considered under all circumstances, would assume actual significance in the deliberations of a reasonable shareholder.").

[95] *See* Nov. 28 E-mail, *supra* note 26, at A40 (noting that Ray Berry believed it to be an opportune time to sell the Company because of "low valuation of the company in spite of a built-in buy-out premium as well as the complexity of implementing the changes [new CEO] Rick Anicetti covered in the earnings release while under the scrutiny of the public market").

[96] *Berkman*, 180 A.3d at 1062 ("It is inherent in the very idea of a fiduciary relationship that the stockholders that directors serve are entitled to give weight to their fiduciaries' opinions about important business matters.").

[97] Complaint, *supra* note 11, ¶ 122 (A182).

the existing disclosures sufficient.[98]  That was error.  The 14D-9 did disclose that, at the October 15, 2015 Board meeting, the Board decided to create the Committee "to enhance efficiency in light of the fact that TFM *could become* the subject of shareholder pressure and communications and potentially additional unsolicited acquisition proposals in light of TFM's recent stock performance."[99]  However, the minutes of that meeting reveal that the 14D-9 omits an important point: the Company had actually *already* become subject to stockholder pressure.  In fact, before forming the Committee, the Board discussed "that there *had been* a *significant amount of shareholder outreach recently* regarding the strategic direction of the Corporation."[100]  We believe there is more than a semantic difference between the possibility that there "*could*" be stockholder pressure, as suggested in the 14D-9, and "there *had been a significant amount of shareholder outreach recently*," as revealed in the minutes.  Given the Company chose to speak on the topic, stockholders were entitled to know the depth and breadth of the pressure confronting the Company, especially given that it already existed.[101]

---

[98] *Chancery Op.*, 2017 WL 4317252, at *3.

[99] 14D-9, *supra* note 6, at 18 (A76) (emphasis added).

[100] Oct. 15, 2015 Minutes, *supra* note 23, at A32 (emphasis added).  In particular, the directors discussed the Neuberger letter—an example of such activist outreach.  *See id.*; Neuberger Letter, *supra* note 54, at A26.  The 14D-9 fails to mention that letter altogether.

[101] *See* Balotti & Finkelstein, *supra* note 95, § 17.2 ("Although the board generally is not required to disclose all of the 'bends and turns in the road' in summarizing a proposed transaction, the Delaware Supreme Court has suggested that, once a board travels down the path of describing its process, it has a duty to provide a full and fair characterization of events." (quoting *McMillan v. Intercargo Corp.*, 1999 WL 288128, at *9 (Del. Ch. May 3, 1999))).

## III.

As in *Berkman*, "given the nature of the omission[s]," we decline "defendants'

invitation for us to find another ground for affirmance, such as reliance on the exculpatory

charter provision, which was not addressed by the Court of Chancery."[102]

For the reasons set forth above, we REVERSE the Court of Chancery's opinion and

REMAND for proceedings consistent with this opinion.

---

[102] *Berkman*, 180 A.3d at 1064-65.