# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

TEAMSTER MEMBERS RETIREMENT )
PLAN, individually and on behalf of all )
others similarly situated, )
                         )
         Plaintiff, )
                         )
         v. )      C.A. No. 2020-0807-MTZ
                         )
RANDALL S. DEARTH, ROBERT M. )
FORTWANGLER, STEVAN R. )
SCHOTT, JAMES A. COCCAGNO, )
CHAD WHALEN, J. RICH )
ALEXANDER, WILLIAM J. LYONS, )
LOUIS S. MASSIMO, WILLIAM R. )
NEWLIN, JOHN J. PARO, JULIE S. )
ROBERTS, TIMOTHY G. RUPERT, )
DONALD C. TEMPLIN, KURARAY )
CO., LTD., KURARAY HOLDINGS )
U.S.A., INC. AND MORGAN STANLEY )
& CO. LLC, )
                         )
         Defendants. )

## MEMORANDUM OPINION

Date Submitted: February 22, 2022
Date Decided: May 31, 2022

R. Bruce McNew, COOCH AND TAYLOR, P.A., Wilmington, Delaware; Randall J. Baron and David T. Wissbroecker, ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California; Christopher H. Lyons, ROBBINS GELLER RUDMAN & DOWD LLP, Nashville, Tennessee, *Attorneys for Plaintiff Teamster Members Retirement Plan.*

Stephen C. Norman, Tyler J. Leavengood, and Christopher D. Renaud, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Marc J. Sonnenfeld, Michael L. Kichline, and Matthew D. Klayman, MORGAN, LEWIS & BOCKIUS LLP, Philadelphia, Pennsylvania; Robert H. O'Leary, MORGAN, LEWIS & BOCKIUS LLP, San Francisco, California, *Attorneys for Defendants Randall S. Dearth, Robert M. Fortwangler, Stevan R. Schott, James A. Coccagno, Chad Whalen, J. Rich Alexander, William J. Lyons, Louis S. Massimo, William R. Newlin, John J. Paro, Julie S. Roberts, Timothy G. Rupert, and Donald C. Templin.*

**ZURN, Vice Chancellor.**

In March 2018, a major Japanese chemical manufacturer acquired a Pittsburgh-based activated carbon company for $1.1 billion in a cash-out transaction. The acquisition was the culmination of years of discussions between the target and the buyer about various strategic transactions. The final price represented a 62.9% premium over the target's unaffected stock price. The target's stockholders voted overwhelmingly in favor of the transaction.

The single-bidder process predictably attracted scrutiny. The plaintiff here, a former target stockholder, criticizes the acquisition and the process that led to it, and sought company documents to investigate its theory and then to sue. The stockholder claims the buyer's promise of continued employment incentivized the company's fiduciaries to make a deal happen by depressing valuation information and tainting the negotiation process. The target's former directors and officers moved to dismiss the claims against them, contending the stockholder vote approving the transaction was fully informed and uncoerced, and therefore "cleansed" the transaction under *Corwin v. KKR Financial Holdings LLC*.[1] The stockholder counters by asserting three alleged disclosure violations place the acquisition beyond *Corwin*'s reach.

---

[1] 125 A.3d 304 (Del. 2015), *aff'g In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980 (Del. Ch. 2014).

After careful consideration, I conclude none of these alleged disclosure issues indicate the stockholders were not fully informed when they approved the transaction. Because the challenged acquisition was ratified by a fully informed majority of the target's disinterested stockholders, the stockholder's claims against the company's fiduciaries are dismissed.

## I.     BACKGROUND[2]

The Verified Class Action Complaint (the "Complaint") in this action asserts putative class action claims stemming from the March 2018 acquisition (the "Acquisition") of Calgon Carbon Corporation ("Calgon" or the "Company") by defendants Kuraray Co. Ltd. and Kuraray Holdings U.S.A., Inc. (collectively, "Kuraray"). Plaintiff Teamster Members Retirement Plan ("Plaintiff") was a

---

[2] I draw the following facts from the Verified Class Action Complaint, available at Docket Item ("D.I.") 1 [hereinafter "Compl."], as well as the documents attached and integral to it. *See, e.g.*, *Himawan v. Cephalon, Inc.*, 2018 WL 6822708, at *2 (Del. Ch. Dec. 28, 2018); *In re Gardner Denver, Inc. S'holders Litig.*, 2014 WL 715705, at *2 (Del. Ch. Feb. 21, 2014). Citations in the form of "Leavengood Decl. Ex. —" refer to the exhibits attached to Transmittal Declaration of Tyler J. Leavengood Pursuant to 10 *Del. C.* § 3927 in Support of the Revised Opening Brief in Support of the Calgon Carbon Defendants' Motion to Dismiss the Verified Class Action Complaint, available at D.I. 79, D.I. 80, D.I. 81, and D.I. 92. Citations in the form of "OB —" refer to the Revised Opening Brief in Support of the Calgon Carbon Defendants' Motion to Dismiss the Verified Class Action Complaint, available at D.I. 82. Citations in the form "AB —" refer to Plaintiff's Answering Brief in Opposition to the Calgon Carbon Defendants' Motion to Dismiss the Verified Class Action Complaint, available at D.I. 87. And citations in the form "RB —" refer to the Reply Brief in Support of the Calgon Carbon Defendants' Revised Motion to Dismiss the Verified Class Action Complaint, available at D.I. 91.

beneficial owner of Calgon common stock at all relevant times before the Acquisition.

## A. Calgon's Board Explores Strategic Alternatives.

Before the Acquisition, Calgon was a publicly traded activated carbon manufacturer. Its products had multiple applications, including water purification, pollution abatement, and other industrial uses. Calgon originated as the Pittsburgh Coke & Chemical Company in 1942. It had several ties to the Pittsburgh community and was headquartered in the Pittsburgh suburb of Moon Township, Pennsylvania.

Calgon was managed by a nine-member board of directors (the "Board"). All nine directors are defendants in this action: Randall S. Dearth, the Board's chairman; J. Rich Alexander; William J. Lyons; Louis S. Massimo; William R. Newlin; John J. Paro; Julie S. Roberts; Timothy G. Rupert; and Donald C. Templin (together, the "Director Defendants"). In addition to being the Board's chairman, Dearth was also the Company's CEO. Four other officers are named as defendants: Robert M. Fortwangler, the Company's CFO; Stevan R. Schott, the Company's Executive Vice President of the Advancement Materials, Manufacturing and Equipment Division and its former CFO; James A. Coccagno, the Company's Executive Vice President of the Core Carbon and Services Division; and Chad Whalen, the Company's Senior Vice President, General Counsel, and Secretary (together with Dearth, the "Officer Defendants," and with the Director Defendants, the "Individual Defendants").

3

Kuraray is a Japanese chemical manufacturer. As early as January 2014, Kuraray and Calgon were engaged in strategic discussions. These talks originally focused on Calgon acquiring Kuraray's activated carbon business or the two companies collaborating on a joint venture in Asia. In 2015, Calgon approached Kuraray as a potential acquiror for its Japanese subsidiary. None of these discussions bore any fruit.

In September 2016, Calgon engaged Boston Consulting Group ("BCG") to assess Calgon's future prospects. BCG spent several weeks developing its analysis, and presented a report to Calgon's Board on December 14, 2016 (the "BCG Report"). The BCG Report was generally positive about the Company's future. It touted Calgon's leadership in the high-end activated carbon segment. It also identified six long-term strategic options for Calgon: (A) maximize its current business; (B) manage for cash; (C) expand into adjacent activated carbon segments; (D) expand into water purification media through small acquisitions; (E) transform into a purification media company; and (F) sell. BCG projected five-year revenues for each of the five standalone options; 2021 revenues varied from $647 million (option "B") to $1.101 billion (option "E"). BCG advised selling Calgon (option "F") would be most profitable once one of the other strategic initiatives was underway and showing results.

One expansion opportunity is particularly relevant here: the International Maritime Organization's ("IMO") nascent ballast water initiative (the "Ballast Water Initiative"). The IMO enacted the Ballast Water Initiative in September 2016, just as the Board retained BCG. As a background, large ships use ballast water systems for balance during sea travel, which results in the ship taking in water from one location but releasing it into another. This process contributes to the spread of invasive aquatic species and pathogens. IMO and the United States Coast Guard have sought to combat these issues by requiring ships to be retrofitted with water purification systems. When the Ballast Water Initiative was enacted, the IMO scheduled implementation starting in September 2017, with full compliance required by 2024.

Calgon had been preparing to supply ballast water purification systems for some time. In 2010, Calgon acquired Hyde Marine to strengthen its ultraviolet or "UV" business segment. The BCG Report projected Calgon's UV business would benefit substantially from the Ballast Water Initiative in the next five years, growing from a $4 million enterprise value in December 2016 to a $79 million value in 2021. The ten-year outlook was even stronger. Most of the project's expenses were frontloaded, but revenues did not peak until year five. Nearly all the cash flow came in years four through ten of BCG's projections. The BCG Report promoted selling the UV business in 2019, once Calgon captured two years of revenue.

## B. Kuraray Makes Overtures To Acquire Calgon But Calgon Refuses.

Kuraray's acquisition overtures began in August 2016, just before Calgon engaged BCG. In August 2016, a Kuraray representative emailed one of Calgon's investor relations personnel inquiring about a meeting regarding "general introductions of the parties' respective businesses and preliminary discussion regarding potential partnership and/or business synergies."[3] Kuraray representatives traveled to Pittsburgh to meet with Calgon management on October 18. Afterwards, Kuraray asked to follow up with Dearth, as Calgon's CEO, to discuss "M&A," among other things. Kuraray and Calgon representatives met again on January 10, 2017, and executed a "Secrecy Agreement." Whalen contacted the Company's longstanding corporate counsel, Jones Day, to discuss the terms of that agreement.[4] The Secrecy Agreement permitted Calgon and Kuraray to exchange certain confidential information and imposed an eighteen-month standstill on Kuraray publicly announcing any business combination without Calgon's consent.

Next, Kuraray representatives visited three Calgon facilities. After these visits, Kuraray raised the possibility of "an acquisition by Kuraray of Calgon

---

[3] Compl. ¶ 41 (internal quotation marks omitted).

[4] Leavengood Decl. Ex. 5 at 31 [hereinafter "Proxy"]; *see, e.g.*, Compl. ¶¶ 6, 81–83 (discussing the Company's proxy statement).

Carbon."[5] Calgon officials replied that the Company was not for sale. Kuraray followed up with another email reiterating its interest and emphasizing that an acquisition would be attractive to both sides. Dearth again replied that Calgon was not for sale. Calgon representatives met with Kuraray in February and March but did not have substantial discussions. Dearth, Coccagno, and Whalen met Kuraray representatives for dinner on May 31. Despite Dearth repeating that the Company was not for sale, Kuraray's representatives responded they would send an indication of interest for a strategic transaction in early to mid-June.

Dearth reported back to the Board that he had "no details on what level of interest might be delivered; however, [he] believed that it could possibly be an offer to acquire the Company."[6] In preparation for this offer, the Board held a special telephonic meeting on June 5.[7] It formed a "working group" of local directors, all based in Pittsburgh, to run point on the offer: Dearth, Rupert, Newlin, Lyons, and Alexander (the "Working Group").

---

[5] Compl. ¶ 43 (internal quotation marks omitted).

[6] *Id.* ¶ 46 (internal quotation marks omitted).

[7] The Board frequently held "special telephonic meeting[s]" during negotiations, including on June 5, June 15, July 5, July 18, August 16, September 5, September 7, September 14, September 16, September 18, and September 20. *See* Proxy 33–36, 38–41, 43.

**C.**     **Calgon's Interest Heats Up After Kuraray Makes A Concrete Acquisition Offer And Proposes To Keep Management On Board.**

On June 14, Kuraray sent Dearth its initial nonbinding proposal to buy Calgon for $20.00 in cash per share.  This offer explicitly stated that Kuraray was interested in keeping Calgon's management team and U.S. headquarters:

> We believe that Calgon Carbon's experienced management team will be a key asset to Kuraray as we look to create the global market leader in activated carbon with scale and best-in class technologies.  Our intention is to maintain headquarters for this business line in the U.S. and retain and rely on the existing management and employee base to assume all day-to-day responsibility for operating the business and to implement long-term growth initiatives following the consummation of the Transaction.[8]

The Board met the next day and discussed Kuraray's initial offer.  Plaintiff alleges the specific mention of keeping their jobs caused management to change course and favor a sale to Kuraray, although that meeting's minutes do not reflect a discussion of Kuraray's overture to management.

On June 29, the Working Group met with senior management to discuss Kuraray's initial offer.  Also present at the meeting were representatives from the Company's longtime financial advisor, Morgan Stanley & Co. ("Morgan Stanley").[9]  Management and Morgan Stanley discouraged the directors from contacting other

---

[8] *Id.* ¶ 48 (alterations omitted).

[9] *Id.* ¶ 50; Proxy 31.

8

potential strategic acquirors BCG identified because they would be "highly unlikely" to be interested in or capable of buying Calgon.[10] The Working Group "determined to recommend to the full [Board] that [the Company] continue to engage with Kuraray and proceed to a phase of limited and focused due diligence."[11] The Board met on July 5 and adopted the Working Group's recommendation.

The next night, Dearth met a Kuraray representative for dinner. He indicated Calgon would not go forward at $20.00 per share because that price was inadequate. But he left the door open, noting the Board would consider a revised proposal. To facilitate a better offer, Dearth offered Kuraray the opportunity to conduct "limited due diligence."[12] The next day, July 7, Dearth sent a formal letter conveying a similar message and reiterating that the Company was not for sale:

---

[10] Compl. ¶ 50 (internal quotation marks omitted).

[11] *Id.* ¶ 51 (internal quotation marks omitted).

[12] *Id.* ¶¶ 53, 55.

9

While we do not consider our Company to be for sale, we are willing to give Kuraray the opportunity to conduct limited and focused due diligence to, among other things, better understand our standalone financial plan and the key value drivers embedded in it. We envision this focused due diligence effort to involve sharing with you both (i) our financial plan and (ii) the comprehensive strategic report prepared for our Board by [BCG] in January of this year, with certain competitively sensitive information necessarily redacted. In addition, our management team is willing to meet with your team in-person to walk through the plan with you in more detail, and to respond to a limited and focused set of due diligence questions. We very much expect that your review of this non-public information will allow you to identify substantial additional value, both intrinsic to the Calgon Carbon business and in support of a combination between Kuraray and Calgon Carbon.[13]

The Board's investment committee held a special telephonic meeting on July 17.[14] Rupert, Dearth, Coccagno, Fortwangler, and Whalen, along with representatives from Morgan Stanley and Jones Day, were also present.[15] Coccagno presented the investment committee with proposed adjustments to the Company's strategic plan and the corresponding projections.[16] The investment committee determined the updated projections were reasonable, appropriate, and should be presented to the entire Board.[17] The next day, the Board held a special telephonic

---

[13] *Id.* ¶ 55.

[14] *Id.* ¶ 64; Proxy 34–35; *see* Leavengood Decl. Ex. 10 (reproducing minutes of the July 17 meeting).

[15] Proxy 34.

[16] *Id.* 35.

[17] *Id.*

meeting, which was also attended by Coccagno, Fortwangler, Whalen, and representatives from Morgan Stanley and Jones Day.[18] After hearing from the investment committee on the proposed adjustments to the Company's strategic plans and internal projections, the Board adopted those projections.[19]

At that same July 18 meeting, the Board considered Kuraray's interest in retaining senior management and discussed how to manage Dearth's and other senior managers' potential conflicts from post-transaction employment.[20] After excusing Dearth, the Board's independent directors determined no conflict existed, but decided to continue to monitor these issues.[21]

### D. Meanwhile, The IMO Pushes Back the Ballast Water Initiative's Timeline And Calgon Adjusts Its Projections.

Around this time, Calgon management made two changes to its internal projections. It is unclear whether the first change was captured by the adjustments Coccagno presented to the investment committee on July 17 and the Board approved

---

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.* ("The independent directors determined that, based on the information available to them at that time, no conflict of interest existed with respect to the senior management team in a potential transaction with Kuraray, and further determined to continue to monitor the relevant facts and the potential for any divergent interests of the senior management team with respect to the potential transaction.").

on July 18. As for the second change, the only reasonable inference at this stage is that the adjustments approved by the Board did not include it.

The first change related to the Ballast Water Initiative. At some point in July 2017, IMO announced a delay in implementing that project.[22] While the 2024 retrofit deadline stayed in place, the beginning of that process was pushed back from September 2017 to September 2019. Management adjusted its financial plan to delay the start of its Ballast Water Initiative earnings. Fortwangler explained the update "simply delayed the earnings growth projected by BCG by 2 years."[23]

The second change, to the Company's EBITDA projections, was made after the Board approved the updated projections in July 2017. As background, Calgon acquired a company called CECA in late 2016. Since that acquisition, CECA's

---

[22] Plaintiff did not specify when in July the IMO announced the delay. *See* Compl. ¶ 58 ("In July 2017, the IMO announced that it would delay the retrofit implementation portion of the BWI for two years to September 2019."). The Company's June 2017 Form 10-Q similarly refers only to a "July 2017" change:

> Until the July 2017 meeting of the Marine Environment Protection Committee (MEPC) of the IMO, the Company expected to see higher BWTS sales beginning in late 2017 due to the IMO Convention entering into force for all ships on September 8, 2017. At this MEPC meeting, the compliance implementation schedule was amended to delay compliance with standards of the IMO Convention requiring currently in-service vessels to treat their ballast water until September 8, 2019. The Company expects this amendment to the Convention implementation schedule to dampen the pace of near-term market development and demand growth for ballast water treatment systems.

Leavengood Decl. Ex. 4 at 29.

[23] Compl. ¶ 58 (internal quotation marks omitted).

performance exceeded management's expectations, so the projected EBITDA associated with that business correspondingly increased. On July 27, ten days after the Board approved the updated financial plan, a Morgan Stanley representative emailed Fortwangler and Coccagno:

> Separately on the model, will you be providing an updated segmented model that has the CECA EBITDA updated to $18.8MM and the other segments revised downwards so that we get the same total EBITDA as previously shown? We show these outputs in the appendix and plan to have printed copies of the model outputs for reference.[24]

Fortwangler responded: "Attached is the revised model including 2016. The offset to CECA improvements is found in Corporate."[25] Coccagno, Dearth, Whalen, and Schott were copied on Fortwangler's message.[26] This decision refers to this email exchange as the "July 27 Email." Plaintiff claims the adjustment discussed in the July 27 Email was "arbitrary," and performed by management to depress Calgon's value so that a Kuraray transaction, which would allow management to keep their jobs, was more appealing to the Board and Calgon's stockholders.[27]

---

[24] Leavengood Decl. Ex. 30 at Calgon220_00007050; Compl. ¶ 63.

[25] Leavengood Decl. Ex. 30 at Calgon220_00007050; Compl. ¶ 63.

[26] Leavengood Decl. Ex. 30 at Calgon220 00007050; *see* Compl. ¶ 63. The email also attached a spreadsheet titled "CCC Cherry Blossom Model 2017.07.27 (2016 + CECA Corrected)." Leavengood Decl. Ex. 30 at Calgon220_00007050.

[27] *See* Compl. ¶¶ 63–64.

One detail of Plaintiff's theory defies the space-time continuum, so I do not credit it. Plaintiff asserts management and Morgan Stanley altered the projections after July 27, yet somehow presented the altered projections to the Board's investment committee on July 17, and for full Board approval on July 18. *Id.* ¶¶ 63–64; Proxy 35 (disclosing the

## E. Kuraray And Calgon Finalize The Acquisition's Terms, Including Retaining Dearth.

Meanwhile, Kuraray and Calgon continued to negotiate. On August 8, Calgon signed an engagement letter with Morgan Stanley as its financial advisor.[28]

Shortly thereafter, on August 10, Kuraray raised its offer to $21.00 per share, representing a 55.6% premium over the closing price of Calgon's stock that day.[29] The Working Group held a phone call the next day to discuss the revised offer and

_____

Board adopted the "Calgon Carbon Projections" on July 18). The Complaint, which quotes the July 27 Email, and the July 27 Email itself, make plain that this could not have occurred as Plaintiff alleges. *See* Leavengood Decl. Ex. 30 at Calgon220_00007050; Compl. ¶ 63. The Complaint alleges Morgan Stanley suggested these changes on July 27 and that "Fortwangler and Coccagno were happy to oblige" that request later that day. Compl. ¶ 63. Neither the Complaint nor the July 27 Email indicates these adjustments were suggested before July 27. So the adjustment cannot have been part of the projections Coccagno presented on July 17 and the Board adopted on July 18. *See id.* ¶¶ 63–64; Proxy 34–35; *see, e.g.*, *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001) (noting "the trial court is not required to accept every strained interpretation of the allegations proposed by the plaintiff," and "a claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law" (compiling sources)); *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013) (noting that the Court need not "credit conclusory allegations that are not supported by specific facts, or draw unreasonable inferences in the plaintiff's favor"); *see also Flannery v. Genomic Health, Inc.*, 2021 WL 3615540, at *8 (Del. Ch. Aug. 16, 2021) (noting the incorporation by reference doctrine "permits a court to review the actual documents to ensure that plaintiff has not misrepresented their contents and that any inference the plaintiff seeks to have drawn is a reasonable one" (internal quotation marks omitted) (quoting *Voigt v. Metcalf*, 2020 WL 614999, at *9 (Del. Ch. Feb. 10, 2020))). The most reasonable plaintiff-friendly inference is that the July 27 adjustment was made after the Board approved the projections on July 18, and was subsequently included in the projections on which Morgan Stanley relied in issuing its fairness opinion.

[28] Proxy 36.

[29] *Id.*

strategies for eliciting a higher one.[30]  On August 16, the Board met to consider Kuraray's new offer.[31]  After hearing from the Working Group, Jones Day, and Morgan Stanley, the Board directed Morgan Stanley to try to elicit a higher offer from Kuraray.[32]  On August 21, Kuraray raised its offer to $21.50 a share, a 72% premium over that day's closing price.[33]  Kuraray indicated that it would not increase its offer any higher.[34]

The Board met to consider Kuraray's offer on August 23.[35]  At that meeting, Dearth told the Board that "despite the reference in Kuraray's June 14, 2017 proposal to Kuraray's desire to rely on existing management following completion of the transaction, there had been no other overtures or discussions from Kuraray to any member of the senior management team or to the representatives of Morgan Stanley on such topic."[36]

Kuraray ultimately made "repeated requests" to discuss post-Acquisition employment with Dearth.[37]  Dearth and Coccagno met with Kuraray in Japan around

---

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.* 36–37.

[36] *Id.* 37.

[37] Compl. ¶ 65 (internal quotation marks omitted).

August 29.[38] Kuraray indicated it planned to maintain Calgon's standalone brand and name, likely operating the company as an independent division. Kuraray implied it might want to keep the company's executive management team on board as part of that effort. By August 31, Morgan Stanley put Whalen in touch with Kuraray's human resources to arrange retention interviews. In particular, Kuraray sought a one-on-one with Dearth to discuss his views on Calgon's culture, key managers for retention, equity awards, and potential pay requirements. At the Board's September 7 meeting, Whalen reported that Kuraray expressed "strong interest in having the ability to announce that Mr. Dearth would continue as part of the press release announcing any transaction."[39] The Board also considered Kuraray's request at its September 14 meeting.

The Board permitted Dearth and other managers to go to dinner with Kuraray on September 15, on the condition that employment discussions were limited to Dearth. At that meeting, Kuraray provided employment term sheets for Dearth and the other Officer Defendants. The term sheets included retention bonuses payable three years post-closing. Kuraray continued to reiterate its desire to retain management after this meeting, including in a September 17 email to Dearth. The

---

[38] *Compare id.* ¶ 66 (describing a meeting during the week of August 28), *with* Proxy 37 (describing an August 29 meeting).

[39] Compl. ¶ 69.

two sides had a call on September 19 and, on the morning of September 20, Dearth informed Kuraray he intended to stay on as Calgon's CEO following a merger with Kuraray.

That afternoon, the Board held a special telephonic meeting to consider the Acquisition.[40] Coccagno, Whalen, and representatives from Morgan Stanley and Jones Day were also present.[41] Morgan Stanley presented its opinion on the Acquisition's fairness (the "Fairness Opinion").[42] Morgan Stanley opined that $21.50 per share was a fair price to Calgon's common stockholders from a financial perspective.[43] It also advised "Kuraray was the potential strategic transaction party most likely to offer the greatest value in the near term to Calgon Carbon's stockholders" and "if any other buyer were willing and capable of providing superior value, announcing a transaction with Kuraray would be the best way to elicit such an offer."[44] The Board unanimously declared the Acquisition was advisable and in the Company's best interests.[45]

---

[40] *Id.* ¶ 77; Proxy 43.

[41] Proxy 43.

[42] *Id.* 6, 43. The Fairness Opinion was delivered orally at the meeting and was provided to the Board in writing in advance. *Id.*

[43] *Id.* 43.

[44] Compl. ¶ 77; *see* Proxy 43.

[45] Proxy 43.

The Acquisition was announced on September 21. Calgon and Kuraray memorialized the Acquisition's terms in a merger agreement (the "Merger Agreement"), executed the same day. The final price, $21.50, represented a 62.9% premium over Calgon stock's unaffected trading price before the Board announced the Merger.[46] The Merger Agreement accelerated and cashed out the Director Defendants' unvested equity awards, also at $21.50 per share.[47]

### F. Calgon Issues Its Proxy Statement Recommending The Acquisition.

On November 27, the Company filed a 115-page Schedule 14A proxy statement (the "Proxy"), recommending the stockholders approve the Acquisition.[48] The Proxy notified stockholders a special meeting would be held on December 28 to consider and vote on a proposal to adopt the Merger Agreement.[49] The Proxy also included detailed disclosures regarding the Acquisition's background, negotiations between Calgon and Kuraray, the expected regulatory implementation schedule for the Company's products, and information about the Company's business, recent financial performance, and future prospects. Several disclosures are relevant to this litigation.

---

[46] *Id.* 12, 44.

[47] *Id.* 66–67; *see also* Compl. ¶¶ 15–22 (discussing accelerated equity awards).

[48] *See generally* Proxy.

[49] *Id.* 3.

First, the Proxy attached Morgan Stanley's Fairness Opinion.[50] The Fairness Opinion explained that it considered several sources of information, including "financial projections prepared by the management of the Company," in completing its analysis.[51] It concluded $21.50 per share was fair from a financial point of view to Calgon's common stockholders.[52]

The Proxy also included a set of five-year projections for fiscal years 2017 through 2021, outlining the Company's value and the breakdown of its different projects, divisions, and opportunities.[53] The Proxy discussed two cases. The primary "Management Case" was derived from management's "Calgon Carbon Projections."[54] The Proxy explains the Calgon Carbon Projections were prepared for internal use, adopted by the Board on July 18, and relied upon to evaluate strategic alternatives, including the Acquisition.[55] The Proxy summarizes those projections with some detail, with year-by-year line items for several metrics,

---

[50] *Id.* 6; *see id.* Annex B.

[51] *Id.* B-1.

[52] *Id.* B-3.

[53] Proxy 48–52. The Proxy explains that these projections were "based on the Calgon Carbon 2017 strategic plan as approved by the Calgon Carbon board of directors in the fourth quarter of 2016, adjusted to reflect Calgon Carbon's actual results in the first half of 2017 and Calgon Carbon management's updated views on achievable gross margin levels, further operating expenses, and other matters." *Id.* 48.

[54] *Id.* 48.

[55] *Id.* 35, 48.

including EBITDA.[56] And the Proxy indicates the Calgon Carbon Projections were part of the information Morgan Stanley used to render its Fairness Opinion.[57] The Proxy also references the "Street Case," derived from broker projections.[58] It went on to explain the two cases:

> [A]t the direction of Calgon Carbon's management, Morgan Stanley used forward-looking unlevered free cash flow projections in order to assist Calgon Carbon management and the Calgon Carbon board of directors in their evaluation of the potential merger, and for use in Morgan Stanley's financial analyses . . . . As discussed below, this forward-looking unlevered free cash flow information [(i)] for the Management Case, was derived from the Calgon Carbon Projections and (ii) for the Street Case, was derived from median Wall Street broker projections for Calgon Carbon's performance, extrapolated as discussed below. These unlevered free cash flow projections are subject to all of the cautionary statements and qualifications that this section contains regarding the Calgon Carbon Projections.[59]

The Proxy continues by elaborating on the forward-looking nature of the financial information and the inherent difficulties in forecasting future performance.[60]

The Proxy explained the Board used the Calgon Carbon Projections to consider, analyze and evaluate the Company's strategic and financial alternatives, including the Acquisition.[61] The Proxy did not include projections beyond the 2021

---

[56] *Id.* 50–52.

[57] *Id.* 53–54.

[58] *Id.* 48.

[59] *Id.*

[60] *Id.* 48–49.

[61] *Id.* 48.

fiscal year. It also did not discuss projections for the strategic alternatives in the BCG Report.

### G. Calgon Stockholders Approve The Acquisition.

On December 28, the Company held a special stockholder meeting to consider the Merger Agreement.[62] Nearly 82% of eligible voting shares were represented at that meeting.[63] Stockholders holding 94% of those shares voted to support the Merger.[64] The Acquisition closed on March 9, 2018.[65]

### H. This Litigation Ensues.

Litigation started before the Acquisition closed. It began with Plaintiff's December 14, 2017, demand to inspect the Company's books and records.[66] The demand letter asserted Calgon's Board and management breached its fiduciary duties in connection with the Acquisition.[67] The Company responded on

---

[62] *See* Leavengood Decl. Ex. 22 at 2. I take judicial notice of these facts, contained in Calgon's December 21, 2017 Form 8-K, as they can readily be determined from sources whose accuracy cannot reasonably be questioned. D.R.E. 201(b)(2); *see also In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170–71 (Del. 2006) (affirming the Court of Chancery's decision to take judicial notice of the results of a stockholder vote as documented in the company's SEC filings).

[63] Leavengood Decl. Ex. 22 at 2.

[64] *See id.*; *see also* Compl. ¶¶ 6, 102, 109 (alleging management and Morgan Stanley "misled [the Company's] stockholders into approving the Acquisition").

[65] Leavengood Decl. Ex. 23 at 2.

[66] *Inter-Local Pension Fund GCC/IBT v. Calgon Carbon Corp.*, 2019 WL 479082, at *5 (Del. Ch. Jan. 25, 2019), *aff'd*, 237 A.3d 818 (Del. 2020) (TABLE).

[67] *Id.*

December 21, declining to produce any documents.[68]  The next day, Plaintiff filed a books and records action in this Court.[69]  That action was unusually hard fought.  I largely granted Plaintiff's inspection in a post-trial opinion issued January 25, 2019.[70]  The parties filed cross appeals, and the Delaware Supreme Court affirmed the post-trial decision on August 5, 2020.[71]  The Company thereafter began producing books and records to Plaintiff.

Plaintiff filed the Complaint on September 21, less than two months later, in view of the statute of limitations for doing so.  The Complaint asserted that Calgon's document production was still ongoing and so Plaintiff "likely will[] amend the Complaint to reflect the facts it is continuing to learn through its ongoing investigation and the Company's continuing production of documents."[72]  Plaintiff has not done so, despite receiving substantial documents from the Company afterwards.  The Complaint therefore does not incorporate 5,519 pages of documents Plaintiff had received but not yet reviewed when it was filed, nor the production that followed its filing.[73]

---

[68] *Id.* at *6.

[69] *Id.*

[70] *See generally id.*

[71] *See* 237 A.3d at 818.

[72] Compl. at 2.

[73] *See id.* n.1.

The Complaint asserts four counts. Counts I and II assert breaches of fiduciary duty against the Officer Defendants and the Director Defendants, respectively. Plaintiff contends Calgon's management was motivated not by stockholder value, but by seeking to keep their jobs, and constrained the sale process and depressed calculations of the Company's value in order to draw an offer from their preferred bidder that appeared fair and would keep them in their roles after the Acquisition. Count III alleges Morgan Stanley aided and abetted those breaches, and Count IV alleges Kuraray aided and abetted those same breaches. Plaintiff has since voluntarily dismissed Kuraray and Morgan Stanley; Counts III and IV have accordingly been dismissed.[74]

The Individual Defendants moved to dismiss the remaining counts in the Complaint on May 3, 2021 (the "Motion").[75] Plaintiff responded by moving to convert that motion to one for summary judgment, given the Individual Defendants' extensive reliance on Section 220 documents to support the Motion.[76] After a teleconference, I denied the motion to convert and the Individual Defendants

---

[74] D.I. 51; D.I. 67.

[75] D.I. 44; *see also* D.I. 45; D.I. 47; D.I. 48; D.I. 49.

[76] D.I. 65.

amended their opening brief.[77] The parties completed briefing and the Court heard oral argument on February 22, 2022.[78]

## II. ANALYSIS

The standards governing a motion to dismiss under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief are well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible to proof."[79]

Thus, the touchstone "to survive a motion to dismiss is reasonable 'conceivability.'"[80] This standard is "minimal"[81] and "plaintiff-friendly."[82] "Indeed, it may, as a factual matter, ultimately prove impossible for the plaintiff to prove his claims at a later stage of a proceeding, but that is not the test to survive a motion to dismiss."[83]

---

[77] D.I. 75; D.I. 78; D.I. 82.

[78] D.I. 98; D.I. 99.

[79] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citations omitted).

[80] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[81] *Id.* at 536 (citing *Savor*, 812 A.2d at 896).

[82] *See, e.g.*, *Clouser v. Doherty*, 175 A.3d 86 (Del. 2017) (TABLE); *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *9 (Del. Ch. July 24, 2009).

[83] *Cent. Mortg.*, 27 A.3d at 536.

Because Calgon stockholders received cash for their shares, the Acquisition is presumptively subject to at least enhanced scrutiny under *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc*.[84]  The Individual Defendants argue that the fiduciary duty claims in Counts I and II must be dismissed under *Corwin*[85] because a fully informed, uncoerced majority of Calgon shareholders voted in favor of the Acquisition and, therefore, the business judgment rule unrebuttably applies.  Even if *Corwin* is inapplicable, the Individual Defendants argue that Plaintiff's fiduciary duty counts fail on their merits.

*Corwin* gives rise to the irrebuttable presumption of the business judgment rule when a transaction "is approved by a fully informed, uncoerced vote of the disinterested stockholders."[86]  As Vice Chancellor Glasscock recently explained:

> [*Corwin*] stands for the proposition that where the stockholder-owners of a corporation are given an opportunity to approve a transaction, are fully informed of the facts material to the transaction, and where the transaction is not coercive, there is no agency problem for a court to review, and litigation challenging the transaction is subject to dismissal under the business judgment rule. [87]

---

[84] 506 A.2d 173 (Del. 1986); *see Chester Cty. Empls.' Ret. Fund v. KCG Hldgs., Inc.*, 2019 WL 2564093, at *10 (Del. Ch. June 21, 2019) (citing *Revlon*, 506 A.2d at 184) *accord In re Mindbody, Inc.*, 2020 WL 5870084, at *13 (Del. Ch. Oct. 2, 2020) ("The cash-for-stock Merger was a final-stage transaction presumptively subject to enhanced scrutiny under *Revlon*.").

[85] 125 A.3d at 306.

[86] *Id.* at 309.

[87] *In re USG Corp. S'holder Litig.*, 2020 WL 5126671, at *1 (Del. Ch. Aug. 31, 2020).

To obtain the protection of *Corwin*'s presumption, Defendants must "demonstrate that the [cash-out Acquisition] has been approved by a fully informed, uncoerced majority of the disinterested stockholders."[88]

Though Plaintiff raises several alleged disclosure deficiencies, I conclude that the stockholder vote approving the Acquisition was fully informed. There is no dispute that the vote was uncoerced. Because Plaintiff does not allege waste, its breach of fiduciary duty claims against the Individual Defendants must be dismissed.[89]

### A. The Stockholder Vote Approving The Acquisition Was Fully Informed.

The pivotal inquiry is whether "Plaintiff has pled facts from which one might reasonably conceive that the vote was not fully informed."[90] If Plaintiff makes such a showing, "*Corwin* will not apply, the business judgment rule will not be available to the Individual Defendants at the pleadings stage and enhanced scrutiny will be the standard of review."[91] In evaluating whether stockholders were fully informed, the

---

[88] *KCG*, 2019 WL 2564093, at *10 (internal quotation marks omitted) (quoting *Corwin*, 125 A.3d at 306).

[89] *See In re Saba Software, Inc. S'holder Litig.*, 2017 WL 1201108, at *8 (Del. Ch. Mar. 31, 2017) (citing *Singh v. Attenborough*, 137 A.3d 151, 151–52 (Del. 2016), and then citing *In re Volcano Corp. S'holder Litig.*, 143 A.3d 727, 750 (Del. Ch. 2016), *aff'd*, 156 A.3d 697 (Del. 2017) (TABLE)).

[90] *Id.* (citing *In re Solera Hldgs., Inc. S'holder Litig.*, 2017 WL 57839, at *7 (Del. Ch. Jan. 5, 2017)).

[91] *Id.*

Court must consider "whether the Company's disclosures apprised stockholders of all material information and did not materially mislead them."[92]  "At the pleading stage, that requires [the Court] to consider whether Plaintiff's complaint, when fairly read, supports a rational inference that material facts were not disclosed or that the disclosed information was otherwise materially misleading."[93]  While defendants bear the ultimate burden of "demonstrating that the stockholders were fully informed when relying on stockholder approval to cleanse a challenged transaction,"[94] a plaintiff challenging the transaction must "first identify a deficiency in the operative disclosure document."[95]  If the plaintiff makes such a showing, "the burden [falls] to defendants to establish that the alleged deficiency fails as a matter of law in order to secure the cleansing effect of the vote."[96]  This inquiry is necessarily "fact-intensive, and the Court should deny a motion to dismiss when developing the factual record may be necessary to make a materiality determination as a matter of law."[97]

The Delaware Supreme Court recently described the "materiality" standard in *Morrison v. Berry*:

---

[92] *Morrison v. Berry*, 191 A.3d 268, 282 (Del. 2018) (citing *Appel v. Berkman*, 180 A.3d 1055, 1057 (Del. 2018)).

[93] *Id.* (citing *Berkman*, 180 A.3d at 1064).

[94] *Volcano*, 143 A.3d at 748 (citing *KKR*, 101 A.3d at 999).

[95] *Solera*, 2017 WL 57839, at *8.

[96] *Id.*

[97] *KCG*, 2019 WL 2564093, at *10 (compiling sources).

An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. Framed differently, an omitted fact is material if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. But, to be sure, this materiality test does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote.[98]

"Just as disclosures cannot omit material information, disclosures cannot be materially misleading."[99] The *Morrison* Court explained the standard for evaluating whether partial disclosures are materially misleading:

As we said in *Arnold v. Society for Savings Bancorp, Inc.*, "once defendants traveled down the road of partial disclosure of the history leading up to the Merger . . . they had an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events." And, in *Zirn v. VLI Corp.*, we explained that, "even a non-material fact can, in some instances, trigger an obligation to disclose additional, otherwise non-material facts in order to prevent the initial disclosure from materially misleading the stockholders."[100]

---

[98] 191 A.3d at 282–83 (footnotes and internal quotation marks omitted) (quoting *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985)); *accord TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) ("An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. . . . It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.").

[99] *Morrison*, 191 A.3d at 283.

[100] *Id.* (alterations in original) (footnotes removed) (quoting 650 A.2d 1270, 1280 (Del. 1994), and then quoting 681 A.2d 1050, 1056 (Del. 1996)).

To be sure, facts are not necessarily material simply because a stockholder may find them "helpful."[101] Delaware courts are cautious in "balancing the benefits of additional disclosures against the risk that insignificant information may dilute potentially valuable information."[102]

> Counterbalancing the mandate for complete disclosure, of course, is recognition of the risk of inundating the stockholder with so much information that the proxy clouds, rather than clarifies, the stockholder's decision. A complaint does not state a disclosure violation by noting picayune lacunae or "tell-me-more" details left out.[103]

"[O]ne sufficiently alleged disclosure deficiency will defeat a motion to dismiss under *Corwin*."[104] Here, Plaintiff points to three separate disclosure problems. First, Plaintiff argues that Defendants misleadingly omitted the Ballast Water Initiative's value from the Proxy's projections. Second, Plaintiff argues Defendants omitted mention of the "offset" to EBITDA documented in the July 27 Email between Morgan Stanley and Fortwangler. And third, Plaintiff argues Defendants failed to disclose certain information contained in the BCG Report.

---

[101] *Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *10 (Del. Ch. June 30, 2014) ("Delaware law does not require information to be disclosed simply because that information might be helpful." (internal quotation marks omitted) (quoting *Skeen v. Jo–Ann Stores, Inc.*, 750 A.2d 1170, 1174 (Del. 2000))).

[102] *Volcano*, 143 A.3d at 749 (citing *Solomon v. Armstrong*, 747 A.2d 1098, 1128 (Del. Ch. 1999), *aff'd*, 746 A.2d 277 (Del. 2000) (TABLE)).

[103] *Salladay v. Lev*, 2020 WL 954032, at *12 (Del. Ch. Feb. 27, 2020) (footnotes omitted) (compiling sources).

[104] *Mindbody*, 2020 WL 5870084, at *26.

After careful consideration, I conclude none of these alleged disclosure deficiencies are meritorious. I address each in turn.

### 1. The Ballast Water Initiative

Plaintiff's primary argument is that the Proxy Statement contained misleading projections because it failed to reflect the "full value" of the Ballast Water Initiative.[105] BCG's original projections for the Ballast Water Initiative indicated Calgon would profit primarily in years four through ten;[106] five-year projections would have captured the profits expected in years four and five. When the IMO delayed the implementation of the Ballast Water Initiative by two years, until September 2019, the Company correspondingly adjusted its assumptions and delayed earnings by two years.[107] Resultingly, most of the Ballast Water Initiative's profits were pushed out of the five-year projection window, while the up-front costs remained.[108]

Plaintiff does not argue the projections in the Proxy were inaccurate. Rather, it objects to their five-year period. Plaintiff asserts that period was "artificially

---

[105] Compl. ¶ 60. The Complaint originally suggested the fairness projections did not include the ballast water opportunity "at all." *Id.* This argument does not appear in Plaintiff's brief, and so, it is waived. *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) (citations omitted); *see generally* AB.

[106] *See* Compl. ¶¶ 37–40, 56, 60.

[107] *Id.* ¶ 58.

[108] *See id.* ¶¶ 39–40, 56–60; *see also* AB 30.

truncated" to reflect the Ballast Water Initiative's costs, but not its profits, and therefore artificially depressed the Company's value.[109] Plaintiff concludes the Proxy's projections should have been adjusted to account for the earnings to come, and that they failed to adequately inform stockholders about the Company's standalone enterprise value.

While there "is no *per se* duty under Delaware law to disclose . . . financial projections given to and relied upon by a financial advisor,"[110] Delaware law recognizes the value of projections to stockholders considering a cash-out transaction. As then-Vice Chancellor Strine observed in *In re PNB Holding Co. Shareholders Litigation*:

> In the context of a cash-out merger, reliable management projections of the company's future prospects are of obvious materiality to the electorate. After all, the key issue for the stockholders is whether accepting the merger price is a good deal in comparison with remaining a shareholder and receiving the future expected returns of the company.[111]

As a general rule, management projections made in the ordinary course of business are reliable and therefore material.[112] The converse is also true: there is no

---

[109] AB 31.

[110] *Dent*, 2014 WL 2931180, at *11.

[111] 2006 WL 2403999, at *15 (Del. Ch. Aug. 18, 2006).

[112] *E.g.*, *Cede & Co. v. Technicolor, Inc.*, 2003 WL 23700218, at *7 (Del. Ch. July 9, 2004) ("When management projections are made in the ordinary course of business, they are generally deemed reliable." (citing *In re Radiology Assocs., Inc. Litig.*, 611 A.2d 485, 490–91 (Del. Ch. 1991))), *aff'd in part, rev'd in part*, 884 A.2d 26 (Del. 2005).

31

"obligation on the part of a board to disclose information that simply does not exist."[113]  And mere disagreements with a financial advisor's methods are not disclosure claims.[114]

Plaintiff simply does not plead that the Company's five-year projections were inaccurate or misleading.  Nor has Plaintiff pled any facts suggesting that the Company's fiduciaries selected a five-year projection window to obscure the Ballast Water Initiative's future value.[115]  Indeed, "five-year forecasts are routine in fairness opinions supporting mergers."[116]  And Plaintiff specifically alleges the delay in earnings was caused by a real-world change that was neither nefarious nor within the Company's control.[117]  Faced with undisputedly accurate and routine projections

---

[113] *In re JCC Hldg. Co., Inc.*, 843 A.2d 713, 721 (Del. Ch. 2003) (citing *In re Dataproducts Corp. S'holders Litig.*, 1991 WL 165301, at *8 (Del. Ch. Aug. 22, 1991)); *see also IRA Tr. FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at *16 (Del. Ch. Dec. 11, 2017).

[114] *See In re 3Com S'holders Litig.*, 2009 WL 5173804, at *6 (Del. Ch. Dec. 18, 2009) ("There are limitless opportunities for disagreement on the appropriate valuation methodologies to employ, as well as the appropriate inputs to deploy within those methodologies.  Considering this reality, quibbles with a financial advisor's work simply cannot be the basis of a disclosure claim."); *Ehlen v. Conceptus, Inc.*, 2013 WL 2285577, at *3 & n.14 (Del. Ch. May 24, 2013) (discussing *3Com*).

[115] *Cf. Maric Cap. Master Fund Ltd. v. Plato Learning, Inc.*, 11 A.3d 1175, 1178 (Del. Ch. 2010) (criticizing "selectively disclosed projections" and concluding the "proxy statement omits material information by, for reasons not adequately explained, selectively removing [estimates] from the projections provided).

[116] *Ehlen*, 2013 WL 2285577, at *3.

[117] *See* Compl. ¶ 56–58.  Indeed, Plaintiff claims these revisions kept the UV business "EBITDA neutral" and "maintain[ed] an appropriate state of preparedness for the [Ballast Water Initiative] while ensuring the business does not burden the EBITDA results of the entire company in the intervening years."  *Id.* ¶ 57.  The IMO's delay was disclosed to

prepared in the ordinary course of business, Plaintiff struggles to identify what the Company should have done differently. Plaintiff variously suggests that the Company should have extended the projection period, or should have revised the five-year projections "to condense and capture the full upside of the [Ballast Water Initiative] without penalizing Calgon's valuation."[118] Absent an allegation of misleading inaccuracy or omission, or other wrongdoing, Plaintiff's disagreement with how Calgon reflected that real-world change in its ordinary course projections does not support a disclosure claim.[119]

This Court rejected a very similar argument as not colorable in *Ehlen v. Conceptus, Inc.*[120] In *Ehlen*, the financial advisor used five-year projections in creating its DCF analysis.[121] The plaintiff criticized this decision and claimed the advisor should have used longer projections because the company was "in growth mode."[122] The Court rejected this claim, finding that it was not a disclosure claim, but rather a simple disagreement with the investment banker's methodology.[123] So

---

Calgon's shareholders in the Company's publicly filed quarterly report dated August 4, 2017. *See* Leavengood Decl. Ex. 4 at 29, 32.

[118] *See* AB 29–33; Compl. ¶ 59.

[119] *See 3Com*, 2009 WL 5173804, at *6; *Ehlen*, 2013 WL 2285577, at *3.

[120] 2013 WL 2285577.

[121] *Id.* at *3.

[122] *Id.*

[123] *Id.*

too here. It may be that Plaintiff would have used a different window for projecting the Company's future or handled the delay adjustments differently. But disagreement with management's or Morgan Stanley's chosen methodology is not a disclosure claim.[124]

As for Plaintiff's suggestion that the Company should have used ten-year projections, the Complaint does not allege that any companywide ten-year projections reflecting the Ballast Water Initiative's value beyond five years existed. Plaintiff makes much of the fact that in 2017, Calgon had a ten-year plan for its UV business; but that is not a ten-year, companywide projection.[125] This deficiency distinguishes this case from the cases on which Plaintiff relies. For example, in *City of Warren General Employees' Retirement Systems v. Roche*, the Court held that a

---

[124] *See 3Com*, 2009 WL 5173804, at *6; *Ehlen*, 2013 WL 2285577, at *3.

Plaintiff spills substantial ink quoting the opinion in the Section 220 case, noting that it held issues with Calgon's projections warranted further investigation. *E.g.*, AB 32. Specifically, that opinion concluded that "on the low credible basis standard, . . . the [Plaintiff] has provided sufficient evidence to investigate the justification and motivation for the length of Calgon's disclosed projections and the July 2017 adjustment thereto." *Calgon Carbon*, 2019 WL 479082, at *12. Plaintiff received the documents it requested to investigate that theory. Despite the benefit of those documents, many of which were not discussed in the Complaint, Plaintiff has pled no facts to suggest any actionable wrongdoing in connection with the Board's decision to use five-year projections. As the Section 220 opinion itself noted, "[w]ere this a plenary disclosure claim, the [Plaintiff's] argument might amount to little more than a naked assertion that the methodology it champions would be superior." *Id.* (alterations and internal quotation marks omitted) (quoting *Ehlen*, 2013 WL 2285577, at *3).

[125] *See* Leavengood Ex. 7 at Calgon220_00003202. That same presentation included several years of strategic planning projections, all of which spanned five years. *See id.* at Calgon220_00003192–97.

complaint pled a material omission of acquisition projections because the company "historically engaged in a consistent practice of growth through acquisitions and that shortly before the Buyout process began, the Company was considering expanding that strategy."[126] In support of that effort, the company prepared, and the board considered, projections showing the company's standalone value.[127] Similarly, in *Chester County Employees' Retirement Fund v. KCG Holdings, Inc.*,[128] the Court held that the plaintiff "pled facts making it reasonably conceivable that the earlier, more optimistic projections, which were prepared in [the company's] ordinary course of business, were . . . material."[129] The company's financial advisor in *KCG* used these omitted projections to create the valuation analysis it presented to the board.[130] No such more encompassing or optimistic companywide projections existed for Calgon; the only longer projections were for the UV division alone and were outdated because of the IMO's delay. To the extent Plaintiff would have the Board prepare, consider, and disclose projections that did not exist, it asks too much under our disclosure law.[131]

---

[126] 2020 WL 7023896, at *21 (Del. Ch. Nov. 30, 2020).

[127] *See id.*

[128] 2019 WL 2564093.

[129] *Id.* at *14.

[130] *Id.*

[131] *See, e.g.*, *JCC Hldg.*, 843 A.2d at 721; *Dataproducts*, 1991 WL 165301, at *8; *Crane*, 2017 WL 7053964, at *16. The same logic bars Plaintiff's claim to the extent it would have the Company create some kind of alternative valuation metric or truncated model that

Plaintiff's disagreement with the Company's projection methodology, without more, does not compel the conclusion that Calgon's stockholders were not informed when they approved the transaction.

### 2. The EBITDA Adjustment Discussed In The July 27 Email

Plaintiff's second disclosure complaint relates to the adjustment to the Company's EBITDA discussed in the July 27 Email. CECA's performance improved above management's expectations and so, its EBITDA increased. Plaintiff casts the Company's corresponding changes to its model as "arbitrary," and complains that they were not disclosed to stockholders.[132] Plaintiff relies on the July 27 Email between Morgan Stanley and Fortwangler, in which the Morgan Stanley representative requested an "updated segment model that has the CECA EBITDA updated to $18.8MM and other segments revised downwards" so that total EBITDA is unchanged.[133]

Plaintiff argues that disclosure of EBITDA projections, but not the EBITDA adjustment referenced in the July 27 Email, renders the Proxy misleading and the

---

would better capture the Ballast Water Initiative's present value in five-year projections. Again, the Complaint specifically alleges such an analysis was never prepared. *See* Compl. ¶ 59. And as explained, a disagreement about Morgan Stanley's methodology in preparing the projections is not a disclosure claim.

[132] Compl. ¶ 63.

[133] Leavengood Decl. Ex. 30 at Calgon220_00007050; Compl. ¶ 63.

stockholder vote uninformed. It builds its materiality case on a single sentence in *KCG*: "if the circumstances surrounding the preparation of final projections relied upon by the Board and disclosed to stockholder[s] cast doubt on their reliability, then those circumstances should be disclosed."[134]

In *KCG*, the target's CEO, who was also a director, initially rejected the buyer's $20.00 per share offer, and the board's proposed $20.21 per share counteroffer, as "too low."[135] But he "promised that he would support the merger *if* he could negotiate a satisfactory compensation and retention pool for himself and his management team."[136] After he struck a deal, the board, including the CEO, approved a $20.00 per share offer.[137] The CEO's management team then made last-minute and drastic downwards adjustments to the company's financial projections, allegedly to help justify a deal at that price.[138] The *KCG* Court explained these circumstances called the fairness projections' reliability into question:

---

[134] 2019 WL 2564093, at *14 (citing *Berkman*, 180 A.3d at 1064, and *Weinberger v. Rio Grande Indus., Inc.*, 519 A.2d 116, 129 (Del. Ch. 1986)); *see also* AB 34.

[135] 2019 WL 2564093, at *1.

[136] *Id.*

[137] *Id.*

[138] *Id.* at *8.

Plaintiff has also pled facts concerning the circumstances of the preparation of the Revised Projections sufficient to cast doubt on their reliability. Plaintiff alleges [the CEO's] management team created the Revised Projections at the last-minute—after the Board approved the $20 per share price, and after [the CEO] secured satisfactory compensation from [the buyer]. Plaintiff further alleges that the Revised Projections were significantly more pessimistic concerning [the company's] standalone value than their immediate prior version.[139]

On that basis, the *KCG* Court concluded "it is reasonably conceivable the earlier projections and the circumstances surrounding the preparation of the Revised Projections would have been viewed as material and should have been disclosed."[140]

Since *KCG*, the language Plaintiff relies on has only been applied once: last week, in *Goldstein v. Denner*.[141] Like *KCG*, *Goldstein* involved drastic, last-minute changes to the target company's fairness projections.[142] And like *KCG*, *Goldstein* concluded the confluence of suspicious circumstances and substantial changes called those projections' reliability into question.[143]

In *Goldstein*, two of the target's directors were approached by a bidder offering around $90 per share.[144] The company's stock was trading in the mid-50s, so, inspired by the bidder's interest, one of the directors used a hedge fund he

---

[139] *Id.* at *14.

[140] *Id.*

[141] 2022 WL 1671006 (Del. Ch. May 26, 2022).

[142] *See KCG*, 2019 WL 2564093, at *14; *Goldstein*, 2022 WL 1671006, at *27.

[143] *See KCG*, 2019 WL 2564093, at *14; *Goldstein*, 2022 WL 1671006, at *27.

[144] 2022 WL 1671006, at *1.

controlled to aggressively buy up the company's shares at the trading price.[145] That director deflected the offer long enough to avoid having to disgorge short-swing profits, then put the company in play.[146] After negotiations, the board offered to sell at $105 per share, and the buyer accepted.[147] But the company's long-range plan supported a much higher valuation of $158.15 per share.[148] So, at the last minute, management changed several key assumptions and reduced the target's projected revenue by $23.7 billion, decreasing the company's standalone value from $14 billion (or $150 per share) to $11 billion (or $99 per share).[149] The board considered a fairness opinion based on those projections, and approved the transaction only four days later.[150] And the target's Schedule 14D-9 disclosed only the adjusted projections.[151] The *Goldstein* Court concluded these suspicious and drastic adjustments called the fairness projections into question and so, the changes should have been disclosed.[152]

---

[145] *Id.*

[146] *Id.*

[147] *Id.*

[148] *Id.* at *13.

[149] *Id.* at *14.

[150] *Id.* at *27.

[151] *Id.*

[152] *Id.*

The startling circumstances surrounding the modified projections in *KCG* and *Goldstein* stand in stark contrast to Plaintiff's allegations here. For one thing, the July 2017 EBITDA adjustment was not at the last minute, nor was it made after the Board had already accepted an offer, as in *KCG* and *Goldstein*.[153] Rather, it occurred after the Board *rejected* Kuraray's $20.00 per share offer and while no other offer was on the table.[154] Lacking a transaction to consider, or even a live offer, the Board was also not about to consider whether to approve the transaction, as in *Goldstein*.[155] And while Kuraray had suggested it would be interested in retaining management, Dearth had not yet signed—or even begun to negotiate—a retention agreement with Kuraray, nor had he conditioned his support for the merger on securing one, as in *KCG*.[156]

Further, the adjustment alleged here was minimal in comparison to what was alleged in *KCG* and *Goldstein*. Morgan Stanley's email indicated that CECA's EBITDA was "updated *to* $18.8MM" and that there was a corresponding downward adjustment in "Corporate."[157] This suggests the total adjustment was less than $18.8

---

[153] *See KCG*, 2019 WL 2564093, at *14; *Goldstein*, 2022 WL 1671006, at *27.

[154] *See* Compl. ¶¶ 48, 63; Proxy 33–36.

[155] *See* 2022 WL 1671006, at *27.

[156] *See* 2019 WL 2564093, at *1, 14; Compl. ¶¶ 63, 65–75.

[157] Leavengood Decl. Ex. 30 at Calgon220_00007050 (emphasis added); *see also* Compl. ¶ 63.

million, and perhaps significantly less. In *KCG*, by contrast, the adjustments were significant and affected multiple metrics across multiple years:

> The Revised Projections (i) lowered [the company's] 2017 net revenue forecast by 2.6% and its 2017 adjusted EBITDA forecast by 21.8%; (ii) cut adjusted EBITDA by $28 million for the terminal year; (iii) cut 2017 adjusted net income by 42.8% from the April 11 projections; and (iv) shrunk [the company's] projections for net revenue, adjusted EBITDA, adjusted net income and book value for all five years.[158]

Similarly in *Goldstein*, the adjustments eliminated over $23 billion in revenue and "reduced the Company's internal estimate of standalone value by one third, bringing the valuation just below the Transaction price."[159]

As for Plaintiff's theory that the EBITDA adjustment was part of a scheme by conflicted management to deceive the Board, obtain its approval of artificially depressed projections, and thereby facilitate a transaction with Kuraray: the Complaint does not support it. The July 27 Email reflects that the adjustment was suggested by Morgan Stanley, not a conflicted Company fiduciary.[160] The July 27 Email was initiated by Morgan Stanley, and the Complaint alleges that the adjustment was made "at Morgan Stanley's request."[161] There are no facts to suggest the adjustment was caused in any way by management's self-interest or a scheme to

---

[158] 2019 WL 2564093, at *8.

[159] 2022 WL 1671006, at *14, *27.

[160] *See* Leavengood Decl. Ex. 30 at Calgon220_00007050.

[161] *Id.*; Compl. ¶ 63.

deceive the Board. And Plaintiff has voluntarily dismissed its claims against Morgan Stanley.[162]

Further, Plaintiff's theory that the offset suggested in the July 27 Email was incorporated in the projections presented on July 17 and 18 to influence the Board's perception of Calgon's value fails as a matter of logic. The July 27 Email indicates the offset was not suggested until ten days later.[163] The plain text of the July 27 Email disassembles Plaintiff's theory that management initiated and made the offset after they knew they would keep their jobs in an acquisition, and then slipped the depressed valuation into the projections the Board reviewed on July 17 and 18 to make the Acquisition look better to the Board.[164]

In sum, neither the suspicious circumstances nor the drastic changes in *KCG* and *Goldstein* are present here. And Plaintiff's allegations of greater wrongdoing are belied by the July 27 Email incorporated by reference into the complaint. The disclosed projections' reliability is not threatened by a relatively small, single change to a single line item for a single year of a single division of the Company, on the advice of an advisor against which no claim is pending, which could not have been used to deceive the Board as Plaintiff suggests, and which was untethered from

---

[162] *See* D.I. 51.

[163] Leavengood Decl. Ex. 30 at Calgon220_00007050.

[164] *See* Compl. ¶ 64; *see also supra* note 27.

42

negotiations about price or employment. The offset in the July 27 Email would not, standing alone, alter the total mix of information available to stockholders.[165] That it was not specifically disclosed does not make the stockholders uninformed.[166]

### 3. Facts From The 2016 BCG Report

Plaintiff's final complaints all stem from the BCG Report. It alleges the Proxy failed to include information about the "existence, nature, and substance of BCG's analyses."[167] Plaintiff also mentions the BCG Report's strategic alternatives, corresponding projections, and other potential acquirors as missing material information. These complaints, too, are without merit.

Plaintiff primarily asserts that the BCG Report contained several strategic alternatives—both alternative buyers and alternative business plans—that the Board

---

[165] *See In re Cogent, Inc. S'holder Litig.*, 7 A.3d 487, 511 (Del. Ch. 2010) ("Whether a particular piece of an investment bank's analysis needs to be disclosed, however, depends on whether it is material, on the one hand, or immaterial minutia, on the other."); *Saba Software*, 2017 WL 1201108, at *10 (same).

[166] Plaintiff also halfheartedly suggests not disclosing this offset led to a misleading partial disclosure. *See* AB 35 (citing *Berkman*, 180 A.3d at 1064). The Proxy twice discloses that Morgan Stanley's calculations were adjusted "for the impact of Calgon Carbon's acquisition of . . . CECA," per the Company's management. Proxy 59–60. But not explaining the specific basis for a single such adjustment does not render this general disclosure misleading. Stockholders are entitled to a "fair summary" of a financial advisor's work; disclosures must "be sufficient for the stockholders to usefully comprehend, not recreate, the analysis." *Saba Software*, 2017 WL 1201108, at *10, (quoting *In re Merge Healthcare Inc.*, 2017 WL 395981, at *10 (Del. Ch. Jan. 30, 2017)); *see also In re Rouse Props., Inc.*, 2018 WL 1226015, at *23 n. 194 (Del. Ch. Mar. 9, 2018) (discussing *Saba Software*).

[167] *See* AB 36.

neither pursued nor disclosed in the Proxy. Plaintiff offers no authority for its argument that the Company should have disclosed the upside opportunities the BCG Report identified.[168] Indeed, settled Delaware law repeats that these alternatives did not need to be disclosed. "Delaware law does not require disclosure of a play-by-play of negotiations leading to a transaction or of potential offers that a board has determined were not worth pursuing."[169] And a disclosure claim will not be supported where it "boil[s] down to an argument that plaintiff disagreed with a Special Committee's decision not to pursue another acquisition proposal and that other stockholders should have been informed about the offer in case they, too, disagreed with the Special Committee."[170] As then-Chancellor Chandler observed in *In re 3Com Shareholders Litigation*, "Delaware law does not require management to discuss the panoply of possible alternatives to the course of action it is proposing."[171] Nor does it "mandate the disclosure of every conceivable valuation

---

[168] *See id.* 40.

[169] *City of Miami Gen. Empls.' v. Comstock*, 2016 WL 4464156, at *15 (Del. Ch. Aug. 24, 2016), ), *aff'd*, 158 A.3d 885 (Del. 2017); *see also David P. Simonetti Rollover IRA v. Margolis*, 2008 WL 5048692, at *12 (Del. Ch. June 27, 2008) ("In the usual case, where a board has not received a firm offer or has declined to continue negotiations with a potential acquirer because it has not received an offer worth pursuing, disclosure is not required.").

[170] *In re Om Gp., Inc. S'holders Litig.*, 2016 WL 5929951, at *14 (Del. Ch. Oct. 12, 2016) (internal quotation marks omitted) (quoting *Comstock*, 2016 WL 4464156, at *15).

[171] 2009 WL 5173804, at *6 (alterations and internal quotation marks omitted) (quoting *Seibert v. Harper & Row, Publ'rs, Inc.*, 1984 WL 21874, at *5 (Del. Ch. Dec. 5, 1984)).

datum, method, or alternative."[172]  This "settled guidance" builds on the truism that "stockholders have a veto power over fundamental corporate changes (such as a merger) but entrust management with evaluating the alternatives and deciding which fundamental changes to propose."[173]

Nor does the Proxy hide the existence of other potential buyers, as Plaintiff suggests.  Though the Proxy did not discuss the potential alternative buyers by name, it explains that the Working Group had a list of alternatives, considered those alternatives, and determined with an advisor that they were not worth pursuing:

> The working group, the members of the Calgon Carbon senior management team and representatives of Morgan Stanley *discussed a list of other potential strategic and financial companies that might be interested in an acquisition of Calgon Carbon* at that time, and determined that it was highly unlikely that any of those potential counterparties would be interested in an acquisition of Calgon Carbon and have the ability to implement an acquisition of Calgon Carbon at that time due to competing strategic priorities and recent acquisitions in the industry.[174]

As in *City of Miami General Employees v. Comstock*, "Plaintiff's substantive disagreement with that decision cannot be recast as a disclosure claim."[175]

---

[172] *In re Novell, Inc. S'holder Litig.*, 2013 WL 322560, at *13 (Del. Ch. Jan. 3, 2013).

[173] *3Com*, 2009 WL 5173804, at *6; *Saba Software*, 2017 WL 1201108, at *13 (describing the general rule from *3Com* as "settled guidance").

[174] Proxy 34 (recounting a June 2017 meeting).

[175] 2016 WL 4464156, at *15.

Any BCG projections corresponding to alternative opportunities were also unnecessary to disclose. Again, projections about a company's future are important to stockholders considering a cash-out merger. "Even in the cash-out merger context, though, it is not our law that every extant estimate of a company's future results, however stale or however prepared, is material."[176] Between the December 2016 BCG Report and the November 2017 Proxy, the Company's circumstances changed. The Ballast Water Initiative had been delayed, causing a corresponding delay in that revenue stream.[177] The Board retained another expert, Morgan Stanley, to analyze the Company and develop updated projections in tandem with management. Any more optimistic projections in the BCG Report were outdated and no longer the Board's best estimates of the Company's future. The Proxy properly disclosed the more recent, more relevant projections prepared by Morgan Stanley. Those disclosures presented a "fair summary of the substantive work performed by the investment bankers upon whose advice" the Board's recommendation was based and was adequate to allow Calgon stockholders evaluate "the sufficiency of the consideration being offered" in the Acquisition.[178]

---

[176] *PNB*, 2006 WL 2403999, at *16.

[177] *See* Compl. ¶¶ 56–58.

[178] *In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 449 (Del. Ch. 2002).

Beyond the contents of the BCG Report, Plaintiff suggests the Proxy misleadingly "conceals" the BCG Report's existence in its discussion of the materials Calgon provided Kuraray during initial due diligence in July 2017.[179] Plaintiff emphasizes that Dearth shared the BCG Report, along with the Company's financial plan, with Kuraray.[180] Plaintiff argues identifying the report would have showed Calgon's preference for Kuraray or attracted other buyers to the mix.[181] The Proxy substantially discloses this exchange of information, indicating that Dearth offered Kuraray "strategic plan and limited other nonpublic information for purposes of enabling Kuraray to increase its proposed price above $20.00."[182]

The space between "the BCG Report" and "limited other nonpublic information" does not amount to "concealing" the BCG Report's existence from the Company's stockholders, as Plaintiff suggests. Nor does it resemble the omissions in *Morrison*,[183] on which Plaintiff relies. In *Morrison*, the target company disclosed its founder engaged in a single conversation with the eventual buyer, after the buyer withdrew its offer, where he agreed to roll his equity interest over into a post-

---

[179] AB 37.

[180] *Id.* (citing Compl. ¶¶ 52–53, 55).

[181] *See id.* 37–38.

[182] Proxy 34.

[183] 191 A.3d at 268.

transaction surviving company.[184]  In reality, so the *Morrison* plaintiff alleged, the founder had several undisclosed conversations with the buyer and reached such an agreement before the acquiror withdrew its offer.[185]  The Court found this omission was material and that the target's disclosures misleadingly suggested the founder had no arrangement with the buyer when, in fact, he did.[186]  *Morrison*'s glaring omission bears no resemblance to the Proxy's disclosure that the Company provided Kuraray with "limited other nonpublic information" instead of specifying the BCG Report.  The BCG Report's existence does not indicate Calgon's fiduciaries harbored a similar preference for Kuraray, so it did not need to be specifically identified to stockholders.

Plaintiff also contends that the BCG Report should have been identified in the Proxy in order to attract competing offers.[187]  This argument misses the point of Delaware's disclosure regime and the materiality standard.  The *Corwin* inquiry is decidedly stockholder focused, as is the inquiry into whether an omitted fact is material.[188]  Indeed, a corporate director's duty of disclosure derives from her duties

---

[184] *Id.* at 277–78.

[185] *Id.*

[186] *Id.* at 284–85.

[187] *See* AB 38 ("Disclosure also would have apprised alternative acquirors that there were well thought out business plans that were not yet reflected in public data, which might support a competing bid.").

[188] *See Corwin*, 125 A.3d at 309 (asking whether a transaction "is approved by a fully informed, uncoerced vote of the disinterested stockholders"); *Morrison*, 191 A.3d at 282

of care and loyalty owed to the company's stockholders.[189]  Disclosures in the merger context are meant to inform stockholders, not serve as marketing materials for other potential buyers.[190]

In sum, the stockholders who approved the Acquisition were fully informed even without the details from or about the BCG Report.

### B.      Counts I And II Must Be Dismissed.

For the foregoing reasons, I am satisfied that Plaintiff has failed to plead that the stockholders' decision to vote for the Acquisition was not fully informed.

---

("An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."); *see also USG*, 2020 WL 5126671, at *1 (Del. Ch. Aug. 31, 2020) (explaining that a fully informed stockholder vote under *Corwin* eliminates an agency problem).

[189] *E.g.*, *Chen v. Howard-Anderson*, 87 A.3d 648, 691 (Del. Ch. 2014) (quoting *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009)).

[190] *Accord In re Wayport, Inc. Litig.*, 76 A.3d 296, 314 (Del. Ch. 2013) ("When directors submit to the stockholders a transaction that requires stockholder approval (such as a merger, sale of assets, or charter amendment) or which requires a stockholder investment decision (such as tendering shares or making an appraisal election), but which is not otherwise an interested transaction, the directors have a duty to exercise reasonable care to disclose all facts that are *material to the stockholders' consideration of the transaction* or matter and that are or can reasonably be obtained through their position as directors." (emphasis added) (internal quotation marks omitted) (quoting Lawrence A. Hamermesh, *Calling Off the Lynch Mob:  The Corporate Director's Fiduciary Disclosure Duty*, 49 VAND. L. REV. 1087, 1099 (1996))); *see also Weinberger*, 519 A.2d at 129–30 (explaining that certain *pro forma* financial statements, were less reliable in the context of merger disclosures because they "were not . . . intended to be relied upon by management or stockholders as evidence of the company's value, but, rather, were intended as an 'advocacy' document").

Plaintiff does not argue that decision was coerced or that a conflicted controlling stockholder put the Acquisition beyond *Corwin*'s reach.

> The legal effect of a fully-informed stockholder vote of a transaction with a non-controlling stockholder is that the business judgment rule applies and insulates the transaction from all attacks other than on the grounds of waste, even if a majority of the board approving the transaction was not disinterested or independent. As our Supreme Court explained, the long-standing policy of Delaware law has been to avoid the uncertainties and cost of judicial second-guessing when the disinterested stockholders have had the free and informed chance to decide on the economic merits of a transaction for themselves.[191]

Given *Corwin*'s application here, "the only claim Plaintiff[] could state that would overcome application of the business judgment rule is a claim for waste."[192] Plaintiff has not attempted to plead that claim. Thus, the Individual Defendants' Motion is granted with respect to the breach of fiduciary duty claims in Counts I and II. Plaintiff has voluntarily dismissed Counts III and IV.

## III. CONCLUSION

For the foregoing reasons, the Motion is **GRANTED**.

---

[191] *In re GGP, Inc. S'holder Litig.*, 2021 WL 2102326, at *34 (Del. Ch. May 25, 2021) (footnotes, alterations, and internal quotation marks omitted) (quoting *KKR*, 101 A.3d at 1001, and then quoting *Corwin*, 125 A.3d at 313).

[192] *Rouse*, 2018 WL 1226015, at *25 (citing *Volcano*, 143 A.3d at 741).